**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 20-7083**

─────────────

CHRISTOPHER COLEMAN,

Petitioner – Appellant,

v.

CHADWICK DOTSON, Dir. Virginia Dept. of Corrections,

Respondent – Appellee.

─────────────

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Norman K. Moon, Senior District Judge.  (7:19-cv-00386-NKM-JCH)

─────────────

Argued:  December 8, 2022                    Decided:  November 21, 2025

─────────────

Before KING, GREGORY, and RUSHING, Circuit Judges.

─────────────

Reversed and remanded by published opinion.  Judge King wrote the majority opinion, in which Judge Gregory joined.  Judge Rushing wrote a dissenting opinion.

─────────────

**ARGUED:**  Jonathan P. Sheldon, SHELDON & FLOOD, P.L.C., Fairfax, Virginia, for Appellant.  Victoria Lee Johnson, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Jason S. Miyares, Attorney General, M. Nicole Wittman, Deputy Attorney General, Donald E. Jeffrey, III, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

─────────────

KING, Circuit Judge:

The petitioner in these 28 U.S.C. § 2254 proceedings is Virginia prisoner Christopher Coleman, a decorated Sergeant of the United States Army who pleaded guilty to two counts of malicious wounding and additional state charges for offenses committed in separate incidents on the same day in March 2011. His evidence is that, at the time of those offenses, Sergeant Coleman was on leave from the military to recover from serious injuries — including a repeat traumatic brain injury — sustained during his wartime service in Afghanistan. For his crimes, Coleman was sentenced in August 2012 to an aggregate prison term of 46 years, with 28 years of active incarceration and 18 years suspended — a sentence well above Virginia's discretionary sentencing guidelines range.

Since then, Sergeant Coleman has sought plenary resentencing by way of state and federal petitions for habeas corpus relief, asserting a Sixth Amendment ineffective assistance of counsel claim premised on several sentencing-related blunders by his court-appointed lawyer. The lawyer's alleged missteps involve, inter alia, the failure to present compelling mitigating evidence — including evidence substantiating Coleman's valorous military service, significant combat injuries, and ensuing struggles with his mental health, particularly post-traumatic stress disorder, or "PTSD" — as well as the failure to object to the improper use of Coleman's expunged juvenile criminal record against him. To date, Coleman has been denied relief on his Sixth Amendment claim, first by the courts of Virginia and more recently, in these resultant § 2254 proceedings, by the federal district court for the Western District of Virginia. As explained herein, however, we are satisfied that Coleman is entitled to the relief he seeks. Consequently, we reverse the judgment of

2

the district court and remand for the court's award of a writ of habeas corpus unless the Commonwealth of Virginia grants Coleman plenary resentencing on his March 2011 crimes within a reasonable time.

I.

A.

According to his evidence, only two months prior to his March 2011 Virginia criminal offenses, Sergeant Coleman was actively serving in the United States Army and engaged in combat service on behalf of our country in Afghanistan. On January 19, 2011, two weeks before his 22nd birthday, Coleman was seriously injured in a rocket attack in Kandahar, suffering physical wounds and his second traumatic brain injury within about three months. As a result, Coleman was hospitalized in several military healthcare facilities abroad before being transferred to the hospital at Fort Bragg outside Fayetteville, North Carolina. In March 2011, after his release from the hospital and while on military leave and struggling with untreated PTSD, Coleman travelled home to the Roanoke, Virginia area.

It was then and there — specifically, on March 17, 2011, both within the City of Roanoke and outside its city limits in Roanoke County — that the crimes underlying these proceedings took place. Following is a summary of the Commonwealth's evidence against Coleman with respect to those offenses, as reflected in the state court records that have been made available to us.

3

1.

In the early hours of March 17, 2011, a highly intoxicated Sergeant Coleman and his friend Taylor Nutt drove in Coleman's vehicle to the Roanoke County residence of a man named David Moore, where Nutt was staying. At Moore's residence, Coleman was arguing with Nutt in the presence of Moore and his wife, Mary Cook-Moore. After Nutt went to bed, Moore asked Coleman to leave the residence, prompting Coleman to become belligerent with Moore. Cook-Moore then took Coleman across the street to the home of her parents, Dana and Edwin Cook, so that Coleman could sleep on the couch and would not attempt to drive while intoxicated. Cook-Moore herself was living with her parents, as she was suffering from medical conditions for which the Cooks were providing care.

At the Cooks' home, when Cook-Moore opened a safe to retrieve her pain medication, Coleman saw a .45 caliber pistol that belonged to Edwin Cook and grabbed the pistol from the safe. Over Cook-Moore's protests that she was afraid of firearms and wanted him to return the pistol to the safe, Coleman loaded and unloaded the pistol several times and pointed it around the room — sometimes at Cook-Moore — insisting that he was showing her how to properly handle the firearm. During that lengthy episode, Coleman pulled the trigger several times without firing the pistol, until he finally fired a single bullet that struck Cook-Moore in her right leg.

Dana Cook was beckoned from upstairs by the sound of the shot and her daughter's cries, finding Coleman sitting beside Cook-Moore on the couch. Coleman then falsely claimed that Cook-Moore had shot herself and said that he had medical training and could help her, while Cook-Moore repeatedly stated that Coleman had shot her. Dana Cook

4

ordered Coleman to get away from her daughter, and Coleman promptly left the Cooks' home and returned to Moore's nearby residence.

Prompted by a 4:03 a.m. call from Dana Cook, officers of the Roanoke County Police Department responded to the Cooks' home, along with an ambulance. Cook-Moore informed the officers that Coleman had shot her, and the officers found the pistol on the couch where Cook-Moore and Coleman had been sitting. In the course of the investigation, the officers determined that one cartridge had been ejected from the pistol and found no evidence that any additional shot had been fired.

Other Roanoke County police officers quickly located Coleman at Moore's nearby residence and took him into custody, noting a strong odor of alcohol about him. When the officers then questioned Coleman, he said that he had been showing Cook-Moore how to use the pistol and that, while they were sitting on the couch, she had put her hand on the pistol and caused it to fire. Coleman was promptly arrested, issued a warrant for the reckless handling of a firearm, and released on an unsecured bond.

Meanwhile, Cook-Moore was transported to a hospital where she underwent emergency surgery — the first of many surgeries she would need to undergo to address grievous injuries from the shooting. The single bullet had travelled at an upward angle, entering Cook-Moore's right leg, exiting her abdomen, and then re-entering her abdomen and shattering a vertebra.

2.

During the afternoon of March 17, 2011, Roanoke County police officers responded to a 4:47 p.m. call from David Moore complaining that Sergeant Coleman was banging on

the door and trying to get into Moore's residence. When the officers arrived at the scene, Coleman had already left. He returned after 7:00 p.m., however, to retrieve his vehicle, which had been parked at Moore's residence since the early morning hours. Seeing Coleman, Dana Cook went outside her home to tell him that he was no longer welcome on the family's property. As reported by Dana Cook to the police in a 7:25 p.m. call, Coleman then attempted to back into her with his vehicle. He also hit a stop sign, sped to the end of the dead-end road, turned around, sped off in the other direction, and nearly hit another person in the process.

3.

Finally, in the late night hours of March 17, 2011, Sergeant Coleman and his friend Taylor Nutt were at a bar called the Bridge Street Grille within the City of Roanoke for the second time that day, having previously been there around 6:00 p.m. At approximately 10:30 p.m., Coleman and Nutt — who both were unfamiliar to the Bridge Street Grille staff and who both appeared to be quite intoxicated — were introduced to a regular bar patron named Tyler Durham and engaged in a brief conversation with him. Five or ten minutes later, Durham approached Coleman as if to shake hands, and Coleman made aggressive gestures toward Durham in response. There was no further interaction between the men until approximately 11:00 p.m., when Coleman and Nutt followed Durham into the men's restroom.

As reported by Durham to officers of the Roanoke City Police Department the next day, Nutt locked the restroom door and assisted Coleman in attacking Durham inside the restroom. Coleman forced Durham to the floor, twisting Durham's ankle and leg, and then

6

stomping and kicking him repeatedly. The attack stopped only when the bar manager unlocked and opened the restroom door from the outside. At that point, Coleman and Nutt rushed out of the restroom, left the bar, and drove away in Coleman's vehicle. An eyewitness later reported the license plate number, and Durham identified Coleman and Nutt as his assailants. In the attack, Durham's ankle was broken in three places, necessitating surgery to install two rods and multiple screws.

## B.

Sergeant Coleman's unlawful activities of March 17, 2011, resulted in indictments being returned against him in two courts of the Commonwealth of Virginia — the Circuit Court for the City of Roanoke and the Circuit Court for the County of Roanoke. For the late night attack on Tyler Durham at the Bridge Street Grille, Coleman was charged in the Circuit Court for the City of Roanoke on July 5, 2011, with malicious wounding and abduction. On August 25, 2011, pursuant to a plea agreement, Coleman pleaded *nolo contendere* — that is, no contest — to the malicious wounding charge. The abduction charge was then dismissed. The plea agreement provided that the prosecution would not seek a sentence exceeding the maximum recommended by Virginia's sentencing guidelines. As Coleman was advised in the plea proceedings, however, the agreement did not preclude the sentencing judge from imposing an above-guidelines sentence.

In connection with the incidents in and around the homes of David Moore and Dana and Edwin Cook on March 17, 2011 — including the early morning episode that culminated in the shooting of Mary Cook-Moore and the evening events involving his vehicle — Coleman was charged in the Circuit Court for the County of Roanoke on June

7

3, 2011, with a variety of offenses. On May 18, 2012, pursuant to another plea agreement, Coleman pleaded guilty to malicious wounding, abduction, and reckless driving. The remaining charges were then dismissed, and the plea agreement contained no terms concerning the sentencing.

C.

Sergeant Coleman was accorded consolidated sentencing proceedings in the two state courts — the Circuit Court for the City of Roanoke and the Circuit Court for the County of Roanoke, both being within the 23rd Judicial Circuit of Virginia — with a single judge presiding. The judge pronounced Coleman's sentence at the conclusion of a hearing conducted on August 24, 2012. Coleman was represented in the sentencing proceedings, as he had been in the plea proceedings, by court-appointed lawyer C. Gregory Phillips. Prosecutors from both the City of Roanoke and Roanoke County represented the Commonwealth.

1.

Prior to the August 2012 sentencing hearing, a probation officer prepared a Presentence Investigation Report. Of note, the Report erroneously stated that Sergeant Coleman had shot Mary Cook-Moore not just once, but three times, during the encounter in her parents' home involving the pistol that Coleman grabbed from the safe. That is, the Report said that Cook-Moore sustained "three gunshot wounds" and that Coleman had

8

"pulled the trigger at times, but [the pistol] did not fire until the last three shots." *See* J.A. 527-29.[1]

The Presentence Investigation Report also emphasized that "Coleman reported he had no juvenile criminal history," but that the probation officer "located juvenile history on Coleman in [three Virginia counties, including] Roanoke County." *See* J.A. 530. As detailed in six more paragraphs of the Report, the juvenile records reflected that a young Coleman had struggled with mental health issues, suicidal ideation and suicide attempts, other self-harm, substance abuse, and behavior problems; had repeatedly been hospitalized in psychiatric facilities and placed in programs and facilities for troubled juveniles; and had been subject to juvenile detention and probation and charged with multiple offenses including breaking and entering, destruction of property, petit larceny, auto theft, disorderly conduct, possession of alcohol and marijuana, and probation violations.[2]

According to the Presentence Investigation Report, Coleman did not share with the probation officer "any of the difficulties he had as a teenager that led him to being hospitalized, placed in detention, or placed in group homes or other facilities." *See* J.A.

---

[1] The Presentence Investigation Report focused on the offenses committed in Roanoke County (including the malicious wounding of Mary Cook-Moore), but also discussed the offense committed in the City of Roanoke (the malicious wounding of Tyler Durham). As the Report explained, the sentencing for the offense in the City of Roanoke was "now set jointly with these current offenses in Roanoke County." *See* J.A. 532. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

[2] The Presentence Investigation Report reflected that as an adult, however, Sergeant Coleman had just one prior conviction, for the misdemeanor offense of profane swearing or intoxication in public. Coleman's punishment for that offense was a $25 fine.

533.    The Report contained limited details of Coleman's family history, only briefly relating that Coleman's father was "currently an inmate of the Virginia Department of Corrections," had "a history of burglary and sex crimes," was "a registered sex offender," and had "a mental health and substance abuse history." *Id.* As for Coleman's mother, the Report stated that she was residing "in Roanoke City with her fourth husband," was "employed as a clinician" with a behavioral healthcare provider, and had no known "substance abuse or criminal history." *Id.* The Report noted that Coleman "reported he had a good childhood," "stated his mother and father divorced when he was a toddler," and "indicated he knew nothing about his father." *Id.* Further, the Report chronicled Coleman's statements that "he was raised by his mother and a stepfather" and that he maintained a relationship with the stepfather following his mother and the stepfather's divorce. *Id.*

At age 18, the Presentence Investigation Report conveyed, Coleman enlisted in the United States Army after completing high school by obtaining a GED. The Report acknowledged that "[r]equested military records have not yet been received" and provided few details of Coleman's military service. *See* J.A. 534. For example, the Report recited in a single paragraph that Coleman

> reported he was stationed in Germany and France, and he was a part of serving in the wars in Iraq and in Afghanistan and earned various medals of achievement. Coleman stated he was on leave and in Roanoke visiting when [the March 17, 2011] offense[s] occurred. He did not specify that he was on medical leave, but information obtained during the investigation of this case indicates his leave was medical due to a head injury in January 2011.

10

*Id.* Further discussion of Coleman's January 2011 head injury was limited to an additional short paragraph relaying his own account that "he was wounded in a rocket attack while in Southern Afghanistan on January 19, 2011"; that "he sustained a concussion and traumatic brain injury" on that occasion; and that he had "sustained more than one concussion from incidents while in the military." *Id.* at 536. The same paragraph underscored that "Coleman described his health as good" and claimed "no medical difficulties as a result of [his combat] injuries." *Id.*

With respect to Coleman's mental health, the Presentence Investigation Report related that — on an unspecified day after committing the March 17, 2011 offenses — Coleman voluntarily admitted himself to the Lewis-Gale Center for Behavioral Health, a mental health hospital in the Roanoke area. As with Coleman's military service, the Report shared few details of his March 2011 hospitalization, noting that "[r]equested medical records have not been received" and providing only information shared by Coleman. *See* J.A. 536. Specifically, the Report stated in a single paragraph that

> [w]hen asked about any mental health history or concerns, Coleman reported he was voluntarily hospitalized in March 2011 at Lewis[-]Gale Center for Behavioral Health. He indicated he went into the hospital after he committed th[ese] current offense[s], and he has been jailed since his release from the hospital on March 25, 2011. Coleman reported he was diagnosed with Post Traumatic Stress Disorder. He stated he is prescribed Paxil.

*Id.*

Otherwise, the Presentence Investigation Report highlighted that — contrary to the juvenile history found by the probation officer — "Coleman did not report any further mental health history." *See* J.A. 536. The Report then spent five paragraphs again detailing

11

Coleman's juvenile record, incorporating references to his criminal conduct into the discussion of his struggles with mental health issues, suicidal ideation and suicide attempts, other self-harm, substance abuse, and behavior problems. The details included that a young Coleman "was reportedly using opiates, cocaine, and abusing Adderall," and that he was once diagnosed with "Opiate dependency, polysubstance abuse, recurrent depression," and "Conduct Disorder." *Id.*

The Presentence Investigation Report also contrasted that juvenile history with Coleman's statement to the probation officer that "he tried cocaine when he was in high school." *See* J.A. 537. In the words of the Report, "Coleman gave no indication that drugs had been an issue for him in the past or that he had been in substance abuse treatment when he was a teenager." *Id.* The Report further related that Coleman denied any present use of drugs, reported "no concerns regarding his use of alcohol," and "claimed [that alcohol] 'was not a contributor in the bar fight'" with Tyler Durham on March 17, 2011. *Id.* Finally, addressing a November 2011 substance abuse screening, the Report stated that "the results indicated an unlikely need for substance abuse treatment" at the present time. *Id.*

As calculated by the probation officer, Virginia's discretionary sentencing guidelines range called for an aggregate prison term between 7 years 4 months, on the low end, and 16 years 3 months, at the high end. That guidelines range was increased by the probation officer's use of Coleman's juvenile criminal record, particularly what the probation officer found to be a final adjudication of delinquency, i.e., a conviction, for the felony offense of breaking and entering.

12

2.

a.

During the August 2012 sentencing hearing, the probation officer was the first witness for the Commonwealth. By their questions, the prosecutors had the probation officer confirm the following: that Sergeant Coleman had untruthfully claimed to the probation officer that "he had no juvenile history"; that Coleman actually had "at least five (5) or six (6) previous contacts . . . in the Juvenile Court system," including convictions of at least one felony and two probation violations; that a young Coleman had been accorded opportunities for rehabilitation and mental health treatment; that although there had "been some alluding about a head injury" sustained by Coleman in Afghanistan two months before his March 17, 2011 offenses, there was no "substantiation of this head injury from the Army Service," as "[t]he records that [the probation officer requested and] received from the military don't have any information about" any head injury; and that Coleman had reported "no concerns regarding his alcohol use and that it was not a contributor to the bar fight" with Tyler Durham. *See* J.A. 249-53.

The probation officer further testified that, in their discussions, Coleman had falsely denied twisting Durham's leg and breaking his ankle, claiming that "'he only stomped or kicked the victim.'" *See* J.A. 250-51. According to the probation officer, Coleman had also lamented that "'the media has blown this up'" and that "'things are destroyed here for me.'" *Id.* at 251. Neither prosecutor questioned the probation officer about — or otherwise acknowledged or addressed during the sentencing hearing — the Presentence Investigation

13

Report's erroneous statement that Coleman had shot Mary Cook-Moore three times, rather than once.

Significantly, Coleman's lawyer did not object to the questioning and testimony regarding Coleman's juvenile history; did not challenge either the Presentence Investigation Report's discussion of the juvenile criminal record or the probation officer's reliance on that record to calculate the sentencing guidelines range; did not contest the Report's erroneous statement that Coleman had shot Cook-Moore three times, rather than once; and otherwise did not seriously cross-examine the probation officer. The lawyer did ask the probation officer whether "[t]he records that [she was] talking about from the military" consisted of a letter of June 27, 2012. *See* J.A. 253. But when the probation officer responded that the records in her possession consisted of a letter of December 9, 2011, and that she did not have any letter of June 27, 2012, the lawyer expressed confusion and then stated, "Nothing further, Your Honor." *Id.*

The only other witness for the Commonwealth was Coleman's shooting victim, Cook-Moore, who described her injuries and their impact on her life. Cook-Moore related that the bullet damage to her spine left her temporarily "paralyzed from [her] toes all the way up to [her] belly button on the right side"; that she continued to require a wheelchair or walker to move around; that the bullet damage to her right leg caused a condition, called avascular necrosis, that necessitated further surgery and that could result in amputation; and that she needed yet another surgery to address "a tremendous amount of scar tissue" from the initial surgery and an incision that had to be left open for three weeks. *See* J.A. 256-57. Additionally, Cook-Moore testified, the sound of the gunshot caused her to lose

14

hearing in her right ear, and the shooting exacerbated her preexisting medical conditions, triggered an adrenal gland deficiency that prevented her from receiving standard pain treatments, and prompted persistent blood clots that required "extremely expensive" daily injections. *Id.* at 257-58, 260. According to Cook-Moore, hers was a "complex condition" that was "only going to get worse" and require not only multiple surgeries, but also painful treatment and therapy, costly equipment, and ongoing around-the-clock care from family members and hired caregivers. *Id.* at 258-60.

Cook-Moore recounted that, prior to the shooting, she had been an avid gardener and "quite active with horses," competing "on a National level in show jumping" and training under "an Olympic Gold Medalist" for the 2012 "Olympics in London." *See* J.A. 255-56. The shooting, however, "completely changed [her] life." *Id.* at 260. She could no longer "ride" or "[l]ead horses," "have a garden," "go on a walk," or "ride a bike," and her activities were now limited to "sit[ting] at home and read[ing] books," along with "spend[ing] time in the hospital." *Id.* at 255, 260-61. The shooting also "devastated [her] family," who helped to both provide and pay for her care. *Id.* at 259-60. Cook-Moore testified that although insurance had covered some of her medical expenses, her out-of-pocket costs had already exceeded $100,000 and it was "impossible" at that time "to put a figure on" what her future expenses would be. *Id.*

Coleman's lawyer did not cross-examine Cook-Moore or seek to have her clarify that she had been shot once, not three times as erroneously stated in the Presentence Investigation Report. Meanwhile, the evidence before the sentencing judge was that Coleman's bar fight victim, Durham, had sustained several thousand dollars in out-of-

15

pocket medical expenses and missed work while awaiting and then recovering from the surgery to repair his broken ankle, but was expected to make a full recovery other than some possible future arthritis. Although Durham attended the sentencing hearing, he elected not to testify.

b.

(1)

Sergeant Coleman testified on his own behalf during the sentencing hearing, and at the outset of his testimony, his lawyer had him confirm that he "did have a juvenile criminal record." *See* J.A. 263. Coleman also testified that he could not recall whether the probation officer had asked him about his juvenile criminal record, and that it was possible that the probation officer had asked and that he had "said no." *Id.* at 263-64. Coleman did not and was not prodded by his lawyer to explain why he may have disclaimed having a juvenile criminal record. The lawyer just briefly queried Coleman about his childhood, eliciting only that Coleman's "father wasn't around," that Coleman "didn't like being around [his] mother at times," and that Coleman "acted out," engaged in "[s]ome bizarre behavior," "[a]ttempted suicide," and was "in a mental institution." *Id.* at 264-65.

Next, the lawyer had Coleman testify about his military service. Coleman explained that, after obtaining his GED and turning 18, he joined the Army because he "wasn't accepting of the behavior that [he] had in [his] adolescence." *See* J.A. 265-66 (elaborating this his past behavior "embarrassed" him, that he "didn't want anything to do with that life," and that he believed "the Army would help [him] grow up"). The lawyer elicited the following details of Coleman's time in the Army: that after his initial 11-month training,

16

Coleman was deployed for 13 months to Iraq, where he conducted reconnaissance as a scout and participated in active combat; that Coleman then reenlisted to go to Fort Bragg, where he spent about a year training other soldiers to go to Afghanistan and provide personal security; that Coleman himself was thereafter deployed to Afghanistan, where he served as a "Section Sergeant" overseeing eight other soldiers and providing personal security for a Lieutenant Colonel named Gaylord; that Coleman lost his best friend in Afghanistan when the friend stepped on an improvised explosive device, or "IED," while he and Coleman were on patrol with Gaylord; that Coleman believed "[i]t was supposed to be" him, and not his friend, killed that day, as the friend had taken Coleman's spot "on the ground" while Coleman remained "in the gun"; and that Coleman was involved in more than 25 firefights in Iraq and Afghanistan and witnessed the killings of 15 fellow service members. *Id.* at 266-71.

As for Coleman's own combat injuries, the lawyer had Coleman testify solely about the injuries sustained in the January 19, 2011 rocket attack in Kandahar. Coleman stated that he "and many other of my soldiers were injured," and that "[t]he details aren't clear exactly if [he] lost consciousness or what exactly had happened to [him], but [he] received a concussion, [a] traumatic brain injury, and tinnitus of the ears." *See* J.A. 269-70. According to Coleman, he spent about six weeks in treatment for those injuries in military healthcare facilities in Afghanistan, the Middle East, and Germany. Coleman said that he was moved to the hospital at Fort Bragg in early March 2011 and released following an evaluation.

17

At that point, Coleman testified, he was "[v]ery paranoid," suffering from "a lot of anxiety" and "agitation," and eager to return to Afghanistan. *See* J.A. 272. Coleman described telling a higher-up that he "was having a difficult time being home [i.e., in the United States]" — something that he had also told the doctors at Fort Bragg, who had given him a prescription for valium and advised him "to go see behavioral health." *Id.* at 273, 291. But Coleman explained that rather than heeding the doctors' advice, he "felt the best thing for [him] to do was just to get away from the Army," so he returned home to the Roanoke area without seeking further medical or mental health treatment. *Id.* at 273. Coleman agreed with his lawyer that his decision making was influenced by his frustration and anger over wanting to be back in Afghanistan, and that he sought no further treatment of any kind, including treatment for his traumatic brain injury or for PTSD.

Coleman further testified that, once home in the Roanoke area, he "felt disconnected from everybody" and "couldn't be around people," including his then-wife and other family members and loved ones. *See* J.A. 274. In addition to his combat injuries and mental health issues, Coleman was "coming off" the "[s]teroid and prednisone use" that he had relied on to bulk up his weight and strength during his overseas military service. *Id.* at 276. There were also several "occasions where [Coleman] actually believed that [he] was in Iraq or Southern Afghanistan." *Id.* at 285.

Addressing the events of March 17, 2011, Coleman said that he was drinking and taking valium in the company of Taylor Nutt, his friend since childhood. Coleman admitted to the early morning shooting of Mary Cook-Moore at her parents' home in Roanoke County, explaining that it was unintentional and that he was "extremely

18

intoxicated." *See* J.A. 277-81. Additionally, Coleman acknowledged that he was "still drinking" when he returned for his vehicle and recklessly drove away that evening, and then when he went with Nutt to the Bridge Street Grille in the City of Roanoke and attacked Tyler Durham that night. *Id.* at 282-84. During his testimony, Coleman made somewhat exculpating assertions about the latter incidents, suggesting that at least some of his reckless driving occurred because his vehicle stalled, and that he attacked Durham in the men's restroom of the Bridge Street Grille because Durham had appeared "to slap . . . or swat" at Coleman when the men "had some words over a pool table." *Id.* Ultimately, however, Coleman testified that he was "a hundred (100) percent" responsible for the harm to both Cook-Moore and Durham. *Id.* at 285.

Coleman further testified that during the morning of March 18, 2011, he was informed in a telephone call that — like Cook-Moore — Durham had been injured and hospitalized. By then, according to Coleman, he was "sobering up" but "still under the same amount of anxiety and irritation and paranoia." *See* J.A. 285. As a result, Coleman explained, he contacted his mother and had her admit him to the Lewis-Gale Center for Behavioral Health that same day. Without asking Coleman for any details of his hospitalization and treatment at the Lewis-Gale Center, his lawyer merely prompted Coleman to agree that "[t]hings got increasingly . . . worse as those . . . days kept moving forward" and he faced prosecution and punishment for his crimes. *Id.*

### (2)

In his cross-examination of Sergeant Coleman, the prosecutor from Roanoke County pounced on Coleman for having "concealed from [the probation officer] that [he]

19

had a juvenile record." *See* J.A. 289. When prodded to agree that he "deceived [the probation officer] on purpose," however, Coleman raised the issue of expungement, responding: "No, I was — I was — I believed that they were expunged and sealed by [a judge named] Judge Trompeter. I just — I didn't understand that they still applied or —." *Id*. The prosecutor then clarified that Coleman "knew that [he] had committed [juvenile] crimes and been convicted of those, but [he] thought that they weren't on [his] record anymore" and "that's why [he] said [to the probation officer] that [he] didn't have . . . a juvenile record." *Id.* at 289-90. But the prosecutor said no more about expungement, instead proceeding to elicit that when Coleman "enlisted in the Army," he did not "bring [his juvenile criminal record] to the attention of the people that were going to enlist [him]" and therefore "did not tell them the truth." *Id.* at 290.

Turning to Coleman's combat injuries of January 19, 2011, the prosecutor from Roanoke County focused on Coleman's claim of PTSD. When Coleman stated that he had been diagnosed with PTSD during his post-injury treatment in the Middle East, the prosecutor led Coleman to agree that he had presented no records confirming that he had "ever been officially diagnosed with that." *See* J.A. 291. Once again attacking Coleman's credibility, the prosecutor elicited that Coleman had "deceived" his commanding officer by obtaining permission to leave Fort Bragg in early March 2011 on a false promise that he would seek further care while home in the Roanoke area. *Id.* at 291-92. The prosecutor also elicited Coleman's agreement that if he had asked his superiors for help with PTSD, "they would [not] have turned [him] away." *Id.* at 292.

20

With respect to Coleman's nearly four years of military service, the prosecutor from Roanoke County led Coleman to agree that he had "received training in small arms"; that he had regularly carried weapons in his role of providing personal security to higher-ups on the battlefield; that he had used those weapons in the more than 25 firefights in which he had been involved; that when he had "shot at [enemy soldiers]," he had "intend[ed] to kill them"; and that he had never "kill[ed] anybody accidentally by firing a weapon at them." *See* J.A. 287-89. The prosecutor then called into question whether Coleman's shooting of Mary Cook-Moore was truly accidental, querying Coleman whether he was "telling this Judge today that when [he] pointed the weapon at [Cook-Moore], being trained as [he was and] with the experience that [he] had, having killed people in the past[,] that [he] didn't intend to shoot the weapon when [he] pulled the trigger?" *Id.* at 296.

By her cross-examination, the prosecutor from the City of Roanoke similarly emphasized Coleman's military training, establishing that Coleman had been "taught hand to hand combat," "knew how to handle [him]self," and was "in good physical condition." *See* J.A. 297-98. The prosecutor also led Coleman to agree that at the time of his attack on Tyler Durham, Durham (at about 5'6" and 180 pounds) was "a man of smaller stature" than Coleman (who stood 6'1" and then weighed more than 200 pounds); that Coleman had "ciphered [sic]" Durham "off from his friends" and "isolated him in the bathroom"; and that by then "beat[ing] up an innocent civilian," Coleman had defied his military training, under which he should have instead acted with "courage and integrity and honor." *Id.* at 297-98, 300, 302-03.

21

(3)

On redirect examination, Sergeant Coleman's lawyer opted to "just go[] through [Coleman's] combat record," relying on Coleman's word alone, without any supporting documentation. *See* J.A. 303-04. During the brief interchange that ensued, the lawyer had Coleman quickly confirm that he "received many commendations and medals while [he was] in the military," including the following: the "Purple Heart," which was awarded for the Kandahar "rocket attack"; the "Combat Action Badge" for that rocket attack and unspecified "firefights"; the "Army Commendation Medal" for "service in Iraq, in Baghdad, Iraq"; the "NATO medal" for "fighting in the Middle East"; and the "Army Service Ribbon" for "being in the Army." *Id.* at 304.

Only thereafter, Coleman's lawyer finally sought to admit some record of Coleman's military service and combat injuries — a single sheet of paper that the lawyer described as "a document of injuries that's from James Gaylord, Lieutenant Colonel." *See* J.A. 306. The prosecutors lodged no objection but underscored that the document did not "appear to reference a head injury." *Id.* at 306-07. Once the sentencing judge accepted the document into evidence "as Defendant's one (1)," Coleman's lawyer remarked that he had been in touch with Gaylord, "who would relay to the Court that [Coleman] was an excellent soldier" and that there had once been a plan "for him to come back [to Afghanistan] to be [a] personal security guard for [Gaylord] again." *Id.* at 307-08. There was no further discussion of Gaylord or the "document of injuries," which was a short memorandum dated January 19, 2011 — the very day of the Kandahar rocket attack — simply stating that Coleman was released from his regiment "for continuation of medical care." *Id.* at 326.

22

Indeed, Coleman's lawyer rested without presenting any witness other than Coleman or any other evidence, including either the December 9, 2011 or June 27, 2012 letter that had been referenced during the lawyer's short exchange with the probation officer.

c.

In the sentencing hearing's closing arguments, the prosecutors once again highlighted Sergeant Coleman's juvenile criminal record, with no objection from Coleman's lawyer and with no acknowledgement from anyone else in the courtroom that such record may have been expunged. The prosecutor from Roanoke County urged the sentencing judge "to look at [Coleman's] juvenile record and the problems that he had then with violence and with mental issues and threats that he made and so forth." *See* J.A. 308. The prosecutor asserted that Coleman's juvenile history showed that "[h]e was messed up before he went [into the Army]," belying any notion that Coleman was instead "messed up by being in combat" or "by the things that [he] saw in Afghanistan." *Id.* at 308-09. The prosecutor even argued that "[w]hat the military did was to give [Coleman] the tools necessary to be the person that he already was," that being "a person who is cruel, a person who [lacks] empathy." *Id.* at 309.

For her part, the prosecutor from the City of Roanoke "concur[red] with" her colleague from Roanoke County, contending that "the history and background of Mr. Coleman" reflected "that the [die] was cast for the mold of his character long ago before he even became a soldier." *See* J.A. 311. The prosecutor continued:

> You look at the background. We have that he's got six (6) contacts with the juvenile system, two of those are felony contacts. He's violating probation. He's being offered counseling and services, he's not responding. He

23

> violates, he gets revoked. It's to the extent where . . . he is just beyond a scope of what they can control and address.

*Id.* According to the prosecutor, a young Coleman "was already well on his way to being a violent and cruel and mean spirited individual," such that the Army "provided a sanctioned outlet for him to act out on those [negative] qualities that he already possessed," rather than being — as he had claimed — a way for him to turn his life around. *Id.* at 311-12.

Unconstrained from doing so by the relevant plea agreement, the prosecutor from Roanoke County requested individual prison terms above Virginia's discretionary sentencing guidelines range as to the offenses committed in Roanoke County, saying that it was not an "exaggeration" to call Coleman's crimes "horrific" and arguing "that the guidelines are not useful in a case like this." *See* J.A. 308-09. The prosecutor from the City of Roanoke agreed "that this is a case where it does call for an upper departure from the guidelines." *Id.* at 313. But being bound by the other plea agreement not to request an above-guidelines sentence with respect to the offense committed within her jurisdiction, she suggested a within-guidelines prison term for that particular crime.

In response to the prosecutors' closing arguments, Coleman's lawyer still did not object to the use of Coleman's juvenile criminal record against him and still did not acknowledge that the record may have been expunged. To the contrary, the lawyer led his closing argument with a reminder that Coleman "when he testified admitted the issues he had criminally as a juvenile." *See* J.A. 314.

The lawyer manifested a strategy in his closing argument to convince the judge to reach "a fair conclusion" by believing and giving weight to Coleman's testimony about his meritorious military service and remorse for his crimes.  *See* J.A. 316-17.  In so endeavoring, the lawyer made no effort to promote Coleman's testimony about his combat injuries — including the testimony regarding his traumatic brain injury of January 19, 2011, and his ensuing struggles with PTSD — or to draw a connection between Coleman's injuries and his criminal conduct.  Moreover, the lawyer expressly conceded that there was "no excuse for what [Coleman] did."  *Id.* at 316.  At bottom, the lawyer argued that although Coleman's criminal conduct was both "horrible" and inexcusable, he should be given credit for "serv[ing] two (2) years of combat duty for our country" and "admitt[ing] what he did was wrong."  *Id.*  The lawyer's entreaty was followed by Coleman's final opportunity to take the stand and make his case, when Coleman simply stated that "[t]here's nothing I can say, Your Honor, except I'm sorry."  *Id.* at 318.

3.

In pronouncing Sergeant Coleman's sentence during the August 2012 hearing, the sentencing judge emphasized that it went "without saying that [his] job [was] not really to consider [Coleman's] particular situation in isolation, nor to consider [victim Tyler] Durham's situation in isolation, nor to consider [victim Mary] Cook-Moore's situation in isolation; but to consider all of it as some sort of a whole."  *See* J.A. 319.  That is, the judge assessed as "a whole" Coleman's criminal conduct of March 17, 2011, rather than separating the offense committed in the City of Roanoke from those committed in Roanoke

25

County. The judge's discussion of his analysis included the Virginia sentencing factors that he deemed to be "absolutely applicable in [Coleman's] situation." *Id.*

Addressing the sentencing factor of "the protection of society against crime" — and necessarily referring to Coleman's juvenile criminal record — the judge expressed his belief that "long before [Coleman] got involved in the military, [he] failed to have" a "normal aspect of humanity," that being "compassion and caring for others." *See* J.A. 319 (adding that "to the extent that [Coleman] had it, [he] certainly didn't seem to have it in any quantity that approaches normalcy"). Yet again, neither the judge nor anyone else in the courtroom said a word about the juvenile criminal record's possible expungement.

On the sentencing factor of "punishment or retribution for the offense," the judge commented that no sentence could "ever make right what has happened," pointing to the physical and emotional damage to Durham and Cook-Moore, along with the toll on their families and community, resulting from Coleman's "horrific" crimes. *See* J.A. 319-20. And on the sentencing factor of "upholding respect for the law," the judge explained that although Coleman's military service was "commendable," "appreciated," and apparently "entirely lawful," his crimes were "about as far from upholding respect for law as can be had." *Id.* at 320-21.

Turning to the sentencing factor of "removing the offender from society whenever it's necessary to protect the public from further criminal activity," the judge rejected the notion that Coleman truly felt remorse. *See* J.A. 321. Specifically, the judge invoked Coleman's "statements to [the probation officer]," i.e., his false denial of twisting Durham's leg and breaking his ankle, as well as his lamentations that "the media has blown

26

this up" and that "things are destroyed here for me." *Id.* In light of those statements to the probation officer, the judge said that Coleman's claims of remorse did not "resonate . . . on any level as being genuine." *Id.*

The final sentencing factor addressed during the hearing was Coleman's "youth," which the judge explained "could call for mitigation of sentence so that we don't lose as a society the productivity and the blessings, the creativity, the goodness of young people." *See* J.A. 321-22. The judge found no such mitigation to be warranted, stating that although he did not intend "to suggest that there's no value to [Coleman's] life" nor any "hope of productivity from [Coleman]," he could not ignore the "most aggravating" aspect of Coleman's case: the timeline of the March 17, 2011 criminal conduct, from the early morning shooting of Cook-Moore to the late night attack on Durham. *Id.* at 322.

Indeed, the judge commented that he "guess[ed]" he "just [didn't] have the requisite sophistication . . . to appreciate how that could have possibly occurred." *See* J.A. 322. Notably, the judge did not indicate whether he believed Coleman's testimony that he had sustained a traumatic brain injury in January 2011 and thereafter struggled with PTSD. Nor did the judge indicate whether he took it upon himself to consider — and reject — a possible connection between those alleged combat injuries and Coleman's March 2011 offenses. Additionally, the judge did not discuss the Presentence Investigation Report's statement that Cook-Moore was shot three times or indicate whether he credited that erroneous assertion.

Ultimately, for the combined City of Roanoke and Roanoke County offenses, the judge sentenced Coleman to the aggregate prison term of 46 years, with 28 years of active

27

incarceration and 18 years suspended on condition of good behavior. That sentence was well above Virginia's discretionary sentencing guidelines range as calculated by the probation officer, which called for an aggregate prison term between 7 years 4 months, on the low end, and 16 years 3 months, at the high end. In the words of the judge, Coleman's case could not "be judged under the guidelines," as "the aggravated circumstances [were] just beyond the pale of the guidelines" and "[t]he guidelines couldn't possibly encompass the facts that are present here." *See* J.A. 322-23.[3]

Under the judge's decision, Coleman is subject to indefinite probation upon release from prison and cannot have any contact with his victims or their immediate family members. The judge ordered Coleman to pay $3,473.32 to Durham in restitution as a condition of probation and ruled that Cook-Moore is entitled to "all statutory restitution" once the amount "becomes capable of determination." *See* J.A. 323. Additionally, the judge imposed a fine of $1,000 for the reckless driving offense.

* * *

After Sergeant Coleman was sentenced, his court-appointed lawyer Gregory Phillips withdrew from further representation and was replaced by Thomas E. Wray, who unsuccessfully pursued direct appeals to the Court of Appeals of Virginia and the Supreme

---

[3] To reach the aggregate term of imprisonment, the sentencing judge imposed the following individual terms of imprisonment, each designated to run consecutively to the others: 15 years, with 7 years of active incarceration and 8 years suspended, for the malicious wounding of Tyler Durham; 20 years, with 15 years of active incarceration and 5 years suspended, for the malicious wounding of Mary Cook-Moore; 10 years, with 5 years of active incarceration and 5 years suspended, for Cook-Moore's abduction; and 12 months for reckless driving.

28

Court of Virginia — with one set of appeals being from the judgment that had been entered in the Circuit Court for the City of Roanoke and another set of appeals being from the judgment that had been entered in the Circuit Court for the County of Roanoke. Those appeals were premised on the contention that the sentencing judge erred by imposing sentence without considering mitigating evidence — i.e., Coleman's own testimony — concerning the traumatic brain injury he sustained in Afghanistan on January 19, 2011, and his ensuing struggles with PTSD. As he was constrained to do, Coleman's appellate lawyer acknowledged that there was no other "evidence presented that Mr. Coleman suffers from PTSD or any other mental illness." *See, e.g.*, J.A. 81 (petition for appeal to the Supreme Court of Virginia from the judgment in the Circuit Court for the City of Roanoke). The lawyer asserted, however, that Coleman's actions "seem[ed] to manifest some severe mental issues" that should have been given favorable consideration by the sentencing judge. *Id.*

The Court of Appeals of Virginia rejected Coleman's contention and affirmed each judgment by separate (but nearly identical) decisions of March 7, 2013, succinctly ruling that the sentencing judge did not abuse his discretion in weighing any mitigating evidence presented by Coleman. Thereafter, the Supreme Court of Virginia summarily denied Coleman's petitions for further appeal by separate (but also nearly identical) decisions of August 28, 2013.

29

D.

1.

Sergeant Coleman filed a pair of petitions for state habeas corpus relief in August 2014, followed by a pair of amended petitions in January 2015 and a pair of second amended petitions in March 2016 — with one of each pair being filed in the Circuit Court for the City of Roanoke and its nearly identical counterpart being filed in the Circuit Court for the County of Roanoke. Consolidated habeas corpus proceedings were conducted by the same judge who had presided over Coleman's consolidated sentencing proceedings. The judge authorized the amended petitions and disallowed the second amended petitions, though he later considered facts raised in the second amended petitions and accepted evidence attached thereto on the parties' joint stipulation. Coleman was represented in the state habeas proceedings first by lawyer David A. Robinson, who was responsible for the filing of the original and amended petitions, and then by lawyer Jonathan P. Sheldon, who handled the filing of the second amended petitions. The named respondent (referred to hereinafter as the "Commonwealth") was represented by the Attorney General of Virginia, who challenged the filing of the second amended petitions and urged the judge to dismiss the original and amended petitions.

By his petitions, Coleman sought plenary resentencing and asserted his Sixth Amendment ineffective assistance of counsel claim. Broadly, Coleman alleged that, in his sentencing proceedings, his then-lawyer Gregory Phillips rendered constitutionally defective representation by failing to act as a zealous advocate for Coleman, by failing to sufficiently investigate Coleman's background and obtain relevant records, by failing to

present the judge with more than a cursory view of Coleman, by failing to have Coleman evaluated for mental illness, and by failing to request a continuance of the sentencing hearing so that the lawyer could adequately prepare.

More specifically, Coleman's ineffective assistance of counsel claim focuses on the following:

- The lawyer's failure to verify and promote Coleman's assertion that his juvenile criminal record had been expunged, to contest the use of that record by the prosecutors to impeach Coleman and by the probation officer to increase his sentencing guidelines range, and to thereby prevent the judge's improper consideration of the juvenile criminal record;

- The lawyer's failure to obtain and present evidence tending to humanize Coleman and contradicting the notion that he was then and always had been a violent and compassionless person, including evidence painting a fuller and fairer picture of his childhood, his military service, and the marked changes in his behavior following his combat injuries;

- The lawyer's failure to obtain and present medical records corroborating and elaborating on Coleman's combat injuries, including his two traumatic brain injuries, as well as his subsequent struggles with PTSD; and

- The lawyer's failure to obtain and present a psychological evaluation of Coleman that would have provided important insight into his criminal conduct of March 17, 2011, from the early morning shooting of Mary Cook-Moore in her parents' Roanoke County home to the late night attack on Tyler Durham in a City of Roanoke bar.

As part of his ineffective assistance claim, Coleman further highlighted the lawyer's failure to challenge the Presentence Investigation Report's erroneous statement that Coleman had shot Cook-Moore three times, rather than once.[4]

2.

In the state habeas corpus proceedings, Sergeant Coleman submitted a plethora of documentary evidence in support of his various petitions, as well as psychological evaluations conducted by two expert witnesses. Additionally, the presiding judge conducted an evidentiary hearing on July 12, 2017, during which seven fact witnesses testified: Coleman himself; five other witnesses appearing for Coleman; and Gregory Phillips, the allegedly deficient lawyer, who was called by the Commonwealth as its sole witness.

a.

With respect to Sergeant Coleman's juvenile criminal record, the habeas corpus evidence established — just as Coleman had indicated during his August 2012 sentencing hearing — that Judge Philip Trompeter of the Juvenile and Domestic Relations District Court for the County of Roanoke had dismissed all charges against Coleman in February

---

[4] Additionally, Sergeant Coleman contended in his second amended petitions for state habeas corpus relief that — although there was "no doubt that [Mary] Cook-Moore was badly injured" in the shooting — the prosecution's sentencing evidence as to "the extent of the injury" and "how it happened" was somewhat "exaggerated." *See* J.A. 361. The judge did not entertain that habeas corpus contention or Coleman's evidence supporting it, including the statement of Cook-Moore's mother to police in the immediate aftermath of the shooting that Cook-Moore "told her the shooting was an accident." *See id.* at 362.

2007 and that his juvenile criminal record was then fully expunged. A contemporaneous letter to Judge Trompeter from the Roanoke County Department of Social Services memorialized that Coleman was approaching his 18th birthday and release from "Intercept Youth Services"; that Coleman's "future plans of going into the Army" were being hindered by his juvenile criminal record; and that Judge Trompeter had advised Coleman "that if he continued to do well at placement his charges would be considered for dismissal in order for him to be accepted into the Army." *See* J.A. 380.

The juvenile criminal record having been expunged, the official juvenile court documents were nonexistent and unavailable to the probation officer when she was preparing Coleman's Presentence Investigation Report in 2012. Instead, the habeas corpus evidence showed that the probation officer located and relied upon an old juvenile probation file — a file that also had been destroyed by the time of the state habeas corpus proceedings. Although the Report briefly noted that the juvenile history provided therein "was obtained from [the juvenile probation] file," *see* J.A. 530, nowhere in the Report did the probation officer acknowledge the lack of corresponding juvenile court records or the obvious possibility that Coleman's juvenile criminal record had been expunged.

Moreover, the habeas corpus evidence called into question the probation officer's finding that Coleman had been convicted as a juvenile of the felony offense of breaking and entering — a finding that resulted in the enhancement of his sentencing guidelines range. According to Coleman, the record of any such felony conviction should have survived expungement pursuant to Virginia law, *see* Va. Code § 16.1-306(B), but no record of his purported breaking-and-entering conviction could be found.

33

During the July 2017 evidentiary hearing, Coleman's witness Tracey Berry, a longtime Roanoke County juvenile surveillance officer, confirmed that Coleman's juvenile criminal record had been fully expunged following Judge Trompeter's dismissal of all charges against Coleman. *See* J.A. 874 (Berry's testimony that she was present in the courtroom when Judge Trompeter dismissed the charges). Questioned whether Coleman had a juvenile criminal record, Berry simply and firmly answered, "No." *Id.* at 872. Berry further testified that — although the Roanoke County Department of Juvenile Justice offices were right across the street from the courthouse — neither she nor any of her colleagues had been contacted around the time of Coleman's August 2012 sentencing by the probation officer, the prosecutors, or defense counsel Gregory Phillips concerning Coleman's juvenile criminal record or other juvenile history.

b.

(1)

The habeas corpus evidence intended to humanize Sergeant Coleman and refute his depiction as a forever violent and compassionless person began with evidence concerning his childhood. That evidence included school and social services records tending to belie the Presentence Investigation Report's suggestion that Coleman was a bad child despite purportedly "ha[ving] a good childhood" and "kn[owing] nothing about his [criminal and sex offender] father." *See* J.A. 533.

For example, a November 2001 school record for Coleman as a 12-year-old seventh grader stated that — although he was "not consistently doing his work" and sometimes "mak[ing] comments which disrupt [other] students" — he was "a neat fellow" with

34

"leadership and academic potential." *See* J.A. 389. The school emphasized, "Everyone likes Chris." *Id.* And it attributed his behavioral issues, per his mother, to "family lifestyle changes" that were "affecting him." *Id.*

According to social services records, around that same time, Coleman had begun "a relationship with his biological father," who introduced Coleman "to a world of drugs, alcohol and sex" and "taught him how to rob, steal and lie." *See* J.A. 390. The records documented beliefs that the father, inter alia, facilitated sexual relationships between Coleman and adult women, including hired prostitutes; directed Coleman to film the father engaging in sex acts with his own partners; and physically and perhaps sexually abused Coleman, including by once stabbing him in the back with a screwdriver. In early 2006, a social services agency elaborated on the ill effects of Coleman's relationship with his father, as follows:

> [Coleman's mother] caught [Coleman] abusing drugs and he admitted to his father's influence. [Coleman] admitted to using marijuana, [Klonopin], acid, cocaine and narcotic pills. It was also discovered that [Coleman] had inappropriate sexual boundaries with his father, his father's girlfriend and possibly with other women directed by his father. [Thereafter,] his father was sent to jail for pornography, robber[y], writing prescriptions and theft of [a] doctor's legal pad. [Coleman] continued to maintain a relationship with his father, under [Coleman's mother's] supervision. When [Coleman] was 15 years old, he was charged with two Petit Larceny charges, one Breaking and Entering charge, one Grand Larceny charge and one Violation of Court Order. [Coleman] was placed on probation and ordered to complete Impact 180 [a juvenile offender program offered as an alternative to commitment in which Coleman excelled]. He completed Impact 180 and once he was home, he started using drugs again, primarily opium and cocaine. In December of 2004, [Coleman] started counseling with [a therapist]. [Coleman] admitted to abusing pills and drugs despite legal consequences and suicidal ideation. [The therapist] recommended inpatient stay at Lewis-Gale for self protection.

35

*Id.* at 390-91 (further describing Coleman's history of mental health hospitalizations up to 2006, as well as his mother's inability to care for him at home and need for individual and family therapy to tend to her own mental health issues and to learn to better help Coleman with his).

Additional habeas corpus evidence reflected that none of the juvenile criminal charges against Coleman was for a violent crime, and that the felony breaking-and-entering charge in particular was merely for stealing beer from a fraternity house at a local college. The evidence also showed that Coleman was sentenced only to the Impact 180 program and was never committed to the Department of Juvenile Justice or transferred to the adult court. Nor were there any allegations that Coleman was violent, except for persistent concerns that he might harm himself. Indeed, much of Coleman's juvenile history had nothing to do with criminal charges, but instead concerned his struggles with his mental health, suicidal ideation, self-mutilation, and substance abuse. Pursuant to the habeas corpus evidence, Coleman embraced the services and treatments accorded him as a teenager, overcame setbacks, and successfully transitioned into being a responsible and self-sufficient adult.

Tracey Berry, the longtime Roanoke County juvenile surveillance officer who appeared as a witness for Coleman during the July 2017 evidentiary hearing, testified that she had regular contact with a young Coleman "for a number of years" — "at least 2003 to 2005" — as part of a mentorship program. *See* J.A. 865. Berry explained that the amount of time spent with a program participant depended on what the participant wanted, and that because Coleman "was one of those kids that enjoyed the mentoring," she spent greater

36

than average time with him, "at least 15, sometimes 20 hours a week." *Id.* at 865-66. Moreover, Berry said that she remembered Coleman well, as his was one of the "good" cases that "tend[ed] to stick out." *Id.* at 866. In Berry's words, "Chris was a good one." *Id.* at 867.

Berry described Coleman as "a compassionate young man" who "never was violent in any way, shape or form." *See* J.A. 867. According to Berry, Coleman would not have been referred to the mentoring program if he had "showed any kind of capacity of violence towards anybody," in that it would not have been allowed "because of the hours and the late nights that we had to spend with the kids." *Id.* Berry also commented that she and her colleagues "absolutely adored Chris" because of his compassion for others. *Id.* Asked for an example of Coleman "expressing compassion or being kind towards other people," Berry shared a story of Coleman's interaction with another program participant, a boy who had recently been diagnosed as being severely autistic; having been informed by Berry before a joint mentoring session that the boy "might not talk" and did not "like to eat," Coleman persuaded him to eat a cheeseburger and "continued to talk to him the whole entire time over a four-hour period." *Id.* at 867-68. Berry emphasized that Coleman's behavior that day was not "unique," but instead "was an example of what he was like all the time." *Id.* at 869-70.

Another witness for Coleman, Elizabeth Pfeiffer, similarly testified during the July 2017 evidentiary hearing to a young Coleman's positive attributes. Pfeiffer recounted that she had worked with Coleman at a restaurant and rented him a room in her house in Staunton, Virginia, when Coleman "was 17, about to be 18" and on the verge of joining

37

the Army.  *See* J.A. 886-87.  At the time, Pfeiffer was a single mother to a seven-year-old son, and Coleman was "super helpful" to her, "great" with her son," and just "a good kid" who never exhibited any violence or cruelty.  *Id.* at 887-88.  Pfeiffer further stated that her ex-husband, who was a police officer, met Coleman and did not object to him being Pfeiffer's tenant.

(2)

Next, the habeas corpus evidence intended to humanize Sergeant Coleman and refute his depiction as a forever violent and compassionless person focused on his military service.  Such evidence included Coleman's DD Form 214, which confirmed, consistent with his August 2012 sentencing hearing testimony, that he was awarded the Purple Heart, the Army Commendation Medal, the NATO Medal, the Army Service Ribbon, and the Combat Action Badge.  Additionally, the DD214 established that Coleman received the Army Achievement Medal, the Army Good Conduct Medal, the National Defense Service Medal, the Afghanistan Campaign Medal (two stars), the Global War on Terrorism Expeditionary Medal, the Iraq Campaign Medal (one star), and the Overseas Service Ribbon (second award).

As a witness for Coleman during the July 2017 evidentiary hearing, his commanding officer, now-Colonel James E. Gaylord, Jr., further illuminated Coleman's distinguished military record.  Gaylord testified that Coleman had served in Gaylord's squadron from 2009 to 2011, first at Fort Bragg and then in Afghanistan.  Based on his trustworthiness, preparedness, and commitment to his fellow soldiers, Coleman was among just "15 or so" squadron members — "out of potentially 400" — selected to serve in Gaylord's personal

38

security detachment. *See* J.A. 891-92. In that role, Coleman was entrusted to provide protection while Gaylord "interact[ed] with Afghan local forces and senior leaders." *Id.* (explaining that Coleman's duties involved "less supervision and more responsibility" than typical for squadron members and required him to be "on [his] game at all times"). Gaylord said that he observed Coleman interacting with both "other members of the military" and "members of the general population of Afghanistan," and never saw him act in an inappropriately "violent or cruel way." *Id.* at 892; *see also id.* at 904 (Gaylord's confirmation that he never knew Coleman to have "a substance abuse problem").

Recounting significant events that occurred during Coleman's deployment in Afghanistan, Colonel Gaylord testified that the squadron arrived there in July 2010 and that, "within a couple months," Coleman was in a lead patrol vehicle that hit an improvised explosive device. *See* J.A. 893. That IED incident was one where, "at a minimum," the soldiers would "normally get concussions," and Coleman and the other vehicle occupants were all treated for injuries. *Id.*

Colonel Gaylord also addressed in his July 2017 evidentiary hearing testimony the death of Coleman's close friend in Afghanistan, as had been mentioned by Coleman during the August 2012 sentencing hearing. Gaylord identified the friend as Sergeant Eric Newman and testified that, while on foot patrol with Gaylord's security detachment in October 2010, "Newman stepped on an improvised explosive device that was actually designed for a vehicle, and you know, obviously the device detonated." *See* J.A. 894. Hesitantly, Gaylord explained that Newman's "torso was completely intact but his hands, arm, forearms were severed, mid-forearm, both of them and both legs were severed mid-

39

calf, and we had to find those pieces of him to try to return him to his family." *Id.* at 894-95. Gaylord further recounted that, although he had promptly "ordered the rest of the platoon to return" to base and directed another "platoon [to] come out [for the search]," Coleman remained at the scene "to assist in finding the body parts of Sergeant Newman." *Id.* at 895. Asked about the effect of Newman's death on the platoon, Gaylord responded that "a loss of any soldier is difficult" but that "everybody took it particularly hard when we lost Sergeant Newman" — not only because of "the physical devastation" to his body, but also because he was "just a good person" who had "kept the platoon in good spirits through a lot of challenging days." *Id.* at 895-96.

Colonel Gaylord then turned in his July 2017 evidentiary hearing testimony to the January 19, 2011 rocket attack that had reinjured Coleman and ultimately sent him back to the United States. Specifically, Gaylord testified that Coleman was eating with other soldiers "in a chow hall" at Kandahar Airfield "when it was attacked by a rocket." *See* J.A. 897. According to Gaylord, the attack "was pretty devastating," both because "typically" only "larger rockets" could "penetrate through the soft skin of the shell of the building" and because the soldiers inside were "on the base" and not wearing their "protective equipment." *Id.* Gaylord stated that such rocket attacks often result in "shrapnel wounds, concussion wounds and death," and he confirmed that Coleman "had both shrapnel wounds and concussion wounds" that were "[v]ery serious" and "exceeded the capacity [of the medical facility at Kandahar Airfield] to be treated properly." *Id.* at 897-98. Coleman was therefore evacuated to "a U.S. hospital in Qatar" and eventually sent back to Fort Bragg, with Gaylord's authorization, for further treatment stateside. *Id.* at 898-900.

40

At that point, Colonel Gaylord testified, he was still in Afghanistan and had "lost visibility" of whether Coleman was getting appropriate care.  *See* J.A. 900.  Gaylord expressed that he did "not believe" that Coleman received all needed treatment, particularly with respect to his mental health.  *Id.*  Gaylord attributed the lack of mental health treatment to the widespread reluctance of soldiers like Coleman to admit they needed it.  As Gaylord explained, "you go from being in a very challenging environment to all of a sudden admitting that you need help and a lot of us don't do that because of the stigma attached to it."  *Id.* at 902.[5]

---

[5] The habeas corpus evidence also included a letter written by Colonel James Gaylord, dated August 18, 2015, "respectfully" urging the judge to "consider a more lenient sentence that allows [Sergeant Coleman] the opportunity to resume leading a productive life out of prison."  *See* J.A. 496.  The letter acknowledged that Coleman had "obviously made some poor decisions" and would "be the first person to admit that fact." *Id.*  Gaylord expressed therein that he did "not want to make excuses for [Coleman], nor [did Coleman] want [him] to," but that he "believe[d] [Coleman's] poor decisions [were] directly related to his service record."  *Id.*

Unlike Colonel Gaylord's July 2017 evidentiary hearing testimony, his August 2015 letter included a discussion of Coleman's service in Iraq, just a year after he entered the Army.  Specifically, the letter explained that Coleman had been "deployed to an area of operations southeast of Bag[h]dad in March 2008" and "conducted numerous high risk operations with his unit to include:  serving as the member of an assault team conducting time sensitive targeting in order to capture high values targets; serving on small kill teams typically employed to defeat enemy personnel emplacing improvised explosive devices (IEDs); and, serving in support of special operations forces focused on interdicting Al Qaeda in Iraq."  *See* J.A. 496.  The letter emphasized that — notwithstanding that his Iraq experience involved "significant enemy contact," "multiple mass casualty events," and being "personally injured in two IED attacks" — Coleman had then "re-enlisted in the Army in the winter 2008 in order to join a new unit being stood up at Fort Bragg."  *Id.*

Turning to Coleman's subsequent service in Afghanistan, the August 2015 letter covered the same events of mid- to late 2010 and early 2011 — the IED and rockets attacks in which Coleman suffered traumatic brain injuries and the violent death of his close friend (Continued)

(3)

The last of the habeas corpus evidence aimed at humanizing Sergeant Coleman and refuting his depiction as a forever violent and compassionless person came from two of his family members, who appeared as witnesses at the July 2017 evidentiary hearing and highlighted the marked changes in Coleman's behavior after he returned to the United States from Afghanistan. Coleman's stepfather, Alex Biles, testified that he had known Coleman since 2001 — when Coleman was a preteen — and that he and Coleman had a strong relationship throughout his marriage to Coleman's mother and then even after their

---

Sergeant Eric Newman — that Colonel Gaylord would later discuss in his July 2017 evidentiary hearing testimony. With respect to Newman's death, the letter illuminated that "[t]he members of the [unit], myself included, experienced survivor's guilt to some degree, but none of us more so than SGT Coleman," who "was subsequently diagnosed with combat stress and anxiety issues at the medical treatment facility at [Kandahar Airfield] and prescribed anti-anxiety medications," but only "given a week to recover" before "readily return[ing] to his duties and perform[ing] at a high level." *See* J.A. 497. Upon noting that Coleman was diagnosed with PTSD while being treated in Qatar for the injuries he sustained in the January 2011 Kandahar rocket attack, the letter advised:

> In retrospect, the stressors SGT Coleman experienced should have necessitated in-patient care when he returned to Fort Bragg. Beyond the physical injuries and survivor's guilt, the fact that he was forced to leave his fellow Soldiers in Afghanistan due to a rocket attack on the [base] after going out on patrols and regularly facing enemy contact, was personally devastating for SGT Coleman. Despite his mental state, the stigma of admitting issues and potentially threatening his career inhibited SGT Coleman's decision to get help at Fort Bragg. Fortunately, the Army has improved in this area regarding care for its Soldiers, but the changes were not in place in time to help SGT Coleman. I sincerely believe his actions on March 17, 2011 that resulted in his incarceration are directly attributable to his service in combat.

*Id.*

42

divorce. Biles noted that Coleman's mother "had a big heart" and was "involved with the different social services and things like that, helping other people out," but that because "[s]he was pulled in different directions," the amount of attention she was able to pay to Coleman was merely "okay." *See* J.A. 856.

As described by Biles, Coleman was an energetic and fun-loving child who was "very" kind and never violent or cruel. *See* J.A. 854-55. Coleman's kindness extended to Biles's son Hunter, who was two years younger than Coleman and who also lived with Biles and Coleman's mother when they were married. According to Biles, Coleman was "best friends with Hunter" and never "a bully to [him]." *Id.* at 855. Coleman was similarly nonviolent with his peers. For example, Biles recalled that while Coleman was in middle school, he joined the football team but failed to complete the season; that was because, though "he was the biggest kid on the team," Coleman "wouldn't hit anybody" and "didn't like the physical side of [football]." *Id.* at 855-56. Coleman instead enjoyed camping, fishing, and playing the guitar, and he opted for the track team in high school.

Biles testified that he saw a much different Coleman in early March 2011, when Coleman was home in the Roanoke area and Biles was living in Alabama, but they met up for a weekend in Gatlinburg, Tennessee. Specifically, Biles recounted that Coleman was "just crazy-eyed" and "overly anxious," as if "he was still looking around corners making sure somebody wasn't shooting [at] him." *See* J.A. 859-60. Biles related that Coleman was also "drinking to excess," straight "out of the bottle." *Id.* Although Biles acknowledged that Coleman had been treated for substance abuse when he was in high

43

school, Biles said that he had never seen Coleman drink like he did that weekend in Gatlinburg.

Another family member, Coleman's second wife Alexis Mooney, testified that she had met Coleman at Fort Bragg in 2009, during Mooney's prior marriage to one of Coleman's trainees.[6] Mooney stated that she had then interacted with Coleman "[a]lmost every day" for a period of "eight months to a year," and she described him as someone with "incredible" military abilities and "[a]bsolute[]" compassion. *See* J.A. 907-08. According to Mooney, Coleman was "the person that anyone went to if anything went wrong, if they needed anything, [or] if they were worried." *Id.* (identifying Coleman as "the go-to for everybody on that team"). Questioned about whether she ever "witness[ed] these soldiers partying," Mooney responded that their parties "happened at [her] house most of the time" and that "out of everybody, [Coleman] was the one who always drank the least." *Id.* at 908. Mooney also said that "if anyone was getting into a scuffle," Coleman "was the one breaking it up and making sure everything was okay." *Id.*

Mooney testified that she stayed in touch with Coleman after he and his squadron were deployed to Afghanistan in July 2010, and that Coleman was "fine" there "up until [his close friend Sergeant Eric Newman's] death" a few months later. *See* J.A. 909.

---

[6] The record reflects that Alexis Mooney was still married to her previous husband and that Sergeant Coleman was still married to his first wife when Coleman committed the March 17, 2011 offenses at issue herein. By the time of the July 2017 evidentiary hearing, however, both those couples had divorced, and Mooney and Coleman had married each other. Mooney did not testify to the exact timeline but clarified that there was "no overlap" between her courtship with Coleman and their respective prior marriages. *See* J.A. 908-09.

44

"Nobody," Mooney emphasized, "was really the same after that." *Id.* When Coleman returned to Fort Bragg to recover from the injuries he sustained in the January 2011 Kandahar rocket attack, "he was pretty much living with" Mooney and her then-husband. *Id.* at 910. Describing the stark changes she observed in Coleman's behavior, Mooney remarked: "Before, [Coleman] was always laughing and had this like giggle that, I don't know. He walked into a room and he was the person everybody wanted to be in the room. Everyone would light up when he was around." *Id.* "When he came back," however, "like there wasn't really anything there." *Id.*

Additionally, Mooney testified that Coleman appeared to be suffering from memory problems, in that "[t]here were things that like would have been normal that he wasn't recognizing." *See* J.A. 910. Mooney offered as an example that she had "a tiny little Chihuahua" who was "the best of buds" with Coleman and would climb up on him for kisses before his deployment to Afghanistan; when the dog climbed up on Coleman after his return to Fort Bragg, however, an apparently confused Coleman asked Mooney what the dog was doing and seemed to have "no recollection of things that would have been normal routine." *Id.* at 910-11.

Mooney acknowledged in her testimony that she was familiar with the "terrible crimes" that Coleman soon thereafter committed on March 17, 2011, including the shooting of Mary Cook-Moore and the attack on Tyler Durham. *See* J.A. 912. Asked if those crimes were "in conformance with the character that [she] knew of Mr. Coleman," Mooney answered: "No, Chris would never hurt a fly. Not at all." *Id.*; *accord id.* at 876 (juvenile surveillance officer Tracey Berry's testimony that she and her colleagues had

45

"been in total shock since" learning of Coleman's March 17, 2011 offenses because that conduct was "[e]xtremely out of character" for him); *id.* at 497 (Colonel James Gaylord's statement in his August 18, 2015 letter to the judge, *see supra* note 5, that Coleman's "regrettable actions in Virginia are not representative of the man I knew and served alongside at Fort Bragg and in southern Afghanistan").

c.

Medical records introduced in the state habeas corpus proceedings corroborated and elaborated on Sergeant Coleman's August 2012 sentencing hearing testimony — as well as the August 2015 letter and July 2017 evidentiary hearing testimony of Colonel James Gaylord — concerning Coleman's combat injuries and subsequent struggles with PTSD. For example, military medical records of January 20, 2011, the day after the Kandahar rocket attack, documented that it was Coleman's "2nd TBI [traumatic brain injury] exposure" within about three months. *See* J.A. 487-88. The records reflected that a CT scan of Coleman's head showed "[n]o abnormal foci" and "[n]o acute intracranial process," but that he experienced "amnesia after the explosion," appeared to witnesses to be "confused," remained in "[s]evere" pain, had "ringing in the ears," and could be expected to "have some stress reaction to the event." *Id.*

Regarding Coleman's voluntary mental health hospitalization in the wake of his March 17, 2011 offenses, the "Discharge Summary" from the Lewis-Gale Center for Behavioral Health verified that Coleman was hospitalized there from March 18 to March 24, 2011. The Discharge Summary stated that, upon admission, Coleman was "reportedly having suicidal ideations," "feeling very overwhelmed with thoughts of killing himself,"

46

and "having some possible PTSD type symptoms." *See* J.A. 503. Based on information shared by Coleman about his military service, combat injuries, then-fresh criminal conduct, and recent alcohol and opioid abuse, the Lewis-Gale Center proceeded to monitor him "closely for any further lethality or any [substance] withdrawal" and to provide him with intensive therapy, medications for mood stabilization and detoxification, and "24 hour psychiatric nursing care." *Id.* During his treatment, Coleman exhibited "remorse for recent events," experienced "opioid cravings" that he "was able to work through with encouragement," and suffered from "frequent nightmares" and "feelings of guilt and anxiety." *Id.* at 503-04. At the time of his discharge, which was "to the Roanoke County jail," Coleman was "not having any further suicidality" but was "having some ongoing depression with some anxiety." *Id.* at 504.

According to the Discharge Summary, Coleman was diagnosed at the Lewis-Gale Center with not only alcohol and opioid dependence, but also PTSD. *See* J.A. 504 (listing Coleman's "Axis I" discharge diagnoses as being "Alcohol dependence," "Opioid dependence," and "Post traumatic stress disorder"). He left the Lewis-Gale Center with a supply of prescribed medications and encouragement to seek further mental health treatment "through the jail judicial system" and the "VA Medical Center." *Id.*

d.

The habeas corpus evidence also included the psychological evaluations of Sergeant Coleman conducted by the two expert witnesses, intended to provide insight into Coleman's criminal conduct of March 17, 2011. First, based on her review of Coleman's "available medical and military records," Dr. JoEllen Salce Rogers, a Florida licensed

47

school psychologist, opined that Coleman's actions on that date — and his "rage, irritability, distractibility and impulsivity" — were "a direct result of his two (2) Traumatic Brain Injuries and Post-Traumatic Stress Disorder because these issues were left untreated." *See* J.A. 843 (Dr. Rogers's affidavit of January 6, 2015).

Dr. Rogers augmented that analysis with an interview-based evaluation of the incarcerated Coleman, conducted by telephone, during which Coleman discussed his childhood history of depression and abuse by his biological father, his significant military experiences and combat injuries, and his subsequent struggles with his mental health and substance abuse. *See* J.A. 844-46 (Dr. Rogers's psychological evaluation of March 13, 2015). Coleman reported to Dr. Rogers that, since the death of his close friend Sergeant Eric Newman in the October 2010 IED incident and his own repeat traumatic brain injury in the January 2011 Kandahar rocket attack, he had been suffering from, inter alia, "frequent" and "vivid nightmares"; "somatic flashbacks including headaches, chest tightening, heart pounding, audible heart thumping in his ears, and heavy breathing"; and "spontaneous psychotic episodes when he saw, smelled, and heard the stimuli surrounding the death of Eric and his own unearthing the bodies of dead children in Bag[h]dad." *Id.* at 844. Further, Coleman reported experiencing panic attacks, suicidal ideation, survivor's guilt, and memory and other cognitive impairments; feelings of being "disconnected and lonely," as well as "angry, irritable, violent, and easily startled"; and "hypervigilance, paranoia, and a distrust of people, even those well[-]intentioned." *Id.* at 844-45. Coleman resorted to "self-medicat[ion]," i.e., "attempts to numb his emotions through drug and alcohol use," which "continued until his arrest." *Id.* at 845.

48

In its concluding paragraph, Dr. Rogers's interview-based evaluation stated as follows:

> Mr. Coleman reports that most of the information included in this [evaluation] was not presented for his defense. No personality assessments were performed, an in-depth psychological evaluation was not attempted. His symptoms prior to his arrest and currently support an extreme reaction to the death of his teammate Eric, his Afghan and Bag[h]dad experiences, and his own two TBI's [traumatic brain injuries]. Furthermore, his history of depression places him at risk for ongoing mental health issues and emotional difficulties. Clearly, he has met criteria for a diagnosis of *Posttraumatic Stress Disorder (PTSD 309.81) with Dissociative Symptoms of Depersonalization and Derealization*. Mr. Coleman's military experiences, two TBI's without subsequent monitoring and treatment, and the witnessed death of his teammate and other life threatening events in Afghan[istan] and Bag[h]dad have caused his past and current PTSD.

*See* J.A. 846.

Next, based on her review of Coleman's "childhood, adolescent and adult medical, psychiatric and military records," Dr. Victoria Reynolds, a North Carolina licensed clinical psychologist, concurred in the diagnoses of "combat-related Posttraumatic Stress Disorder (PTSD)" and "Alcohol and Opioid Dependence disorders." *See* J.A. 836-42 (Dr. Reynolds's declaration, made under penalty of perjury, of January 29, 2016). Dr. Reynolds specified that she, too, found those disorders "as diagnosed by Dr. Rogers in March 2015." *Id.* at 840. Her declaration explained that Dr. Reynolds "specialize[s] in the assessment and treatment of the impact of traumatic life experiences, including childhood sexual and physical abuse, adult rape, military sexual trauma and exposure to combat." *Id.* at 836. Consistent with that expertise, Dr. Reynolds considered Coleman's military experiences and combat injuries, highlighting that "[h]is combat-related PTSD symptoms were . . .

49

repeatedly mentioned in his . . . medical records while in the military and post-deployment." *Id.* at 840.

Additionally, Dr. Reynolds considered Coleman's documented "exposure to childhood maltreatment in the form of physical abuse, exposure to domestic violence and parental neglect." *See* J.A. 840-41 (further discussing the possibility, suggested by Coleman's juvenile records, that he was negatively affected by "sexual abuse, his biological father's alcoholism and his mother's relinquishing of [Coleman] to [social services] custody"). Notably, Dr. Reynolds bemoaned that "none of the records fully assess, document, and describe the entirety of [Coleman's] possible traumatic experiences across his childhood and adolescence," and that there was never a "consistent, appropriately trauma-theory driven attempt to assess or explain such severe behaviors as his self-harm, his numerous suicide attempts or his early and severe addictions to substances." *Id.* at 841.

From the available information, Dr. Reynolds concluded that — because of the "numerous exposures to potentially traumatic experiences" that occurred "throughout his childhood and adolescence" — Coleman "likely exhibited PTSD symptoms prior to his combat exposure." *See* J.A. 841. Recognizing that "chronic PTSD does not simply remit on its own without targeted trauma-specific treatment," Dr. Reynolds further concluded that it was "very likely that [Coleman's] PTSD became more severe, pervasive and unmanageable as [a] result of his combat-related traumas." *Id.* That severe and untreated PTSD, Dr. Reynolds explained, left Coleman susceptible to "further behavioral impairment" and to "'low-road' impulsive and risk-taking behaviors post-deployment,"

50

and it "increased the likelihood that he would return to his use of substances in order to manage these PTSD symptoms." *Id.* Accordingly, Dr. Reynolds emphasized that Coleman's childhood trauma and combat-related PTSD could not "be minimized or overlooked when considering the actions that led to the crime in this case." *Id.*

e.

Finally, Sergeant Coleman proffered habeas corpus evidence directly addressing the performance of his allegedly deficient lawyer Gregory Phillips. That evidence included an affidavit executed by Phillips on July 3, 2014, in which he candidly acknowledged that he "provided ineffective assistance of counsel by failing to request and receive medical records with regard to [Coleman's] prior Traumatic Brain Injury and Post-Traumatic Stress Disorder." *See* J.A. 690. Phillips's affidavit specified that such medical records "should have been presented to the Court in the defense of [his] client, Christopher Scott Coleman." *Id.* Moreover, the affidavit expressed Phillips's "belief that had [he] obtained this information, [Coleman] would have received a lesser sentence." *Id.*

During the July 2017 evidentiary hearing in the state habeas corpus proceedings, Coleman's five fact witnesses uniformly testified that they gladly would have appeared as sentencing witnesses for Coleman but were never asked by Phillips to do so or even advised when the sentencing hearing was to occur. Juvenile surveillance officer Tracey Berry confirmed that she would have attended the sentencing hearing if asked, was just "[a]cross the street" from the courthouse and not "hard to find," and would have testified back then as she was testifying now. *See* J.A. 876-77. Similarly, Coleman's former coworker and landlord Elizabeth Pfeiffer stated that "[o]f course" she would have come to the sentencing

51

hearing if asked and that she would "have testified to the same things that [she] told [the court] today." *Id.* at 889.

Colonel James Gaylord testified that although he had "some contact" with Phillips prior to Coleman's sentencing hearing, Phillips did not "interview" Gaylord or ask him questions like those asked in the state habeas corpus proceedings about "what Sergeant Coleman was like." *See* J.A. 900-01. Gaylord also confirmed that he "[a]bsolutely" would have appeared at Coleman's sentencing hearing had he been informed of its date and importance. *Id.* at 901.

Coleman's stepfather Alex Biles testified that he attended a hearing prior to the sentencing hearing and had been in contact with Phillips during that timeframe, but was never interviewed by Phillips or requested to appear for the sentencing hearing. Biles, too, stated that he "[a]bsolutely" would have come to the sentencing hearing if asked. *See* J.A. 861. As for Coleman's second wife Alexis Mooney, she testified that she had called Phillips's office "multiple times" and "sent an email letting [Phillips] know where [she] would be, that [she was] moving to Hawaii but to give [her] a date and let [her] know and [she] would absolutely be [at the sentencing hearing] and that [she] knew a lot of people that would come as well." *Id.* at 912. Mooney indicated that she never heard back from Phillips.[7]

---

[7] By a sworn declaration of June 27, 2017, an additional fact witness for Sergeant Coleman, his former Army roommate and teammate Sergeant Travis Colson, stated that he "would have made [him]self available to attend [Coleman's] sentencing hearing" and "would have been willing to testify at that hearing to the facts in this declaration." *See* J.A. 847. The declaration recounted Colson and Coleman's deployment to Afghanistan, their (Continued)

52

In his own brief testimony during the July 2017 evidentiary hearing, Coleman asserted that he informed Phillips prior to the August 2012 sentencing hearing that his juvenile criminal record had been expunged. Coleman recounted reviewing his Presentence Investigation Report with Phillips approximately two or three months before the sentencing hearing and being surprised that the Report included a "juvenile record in the past criminal history." *See* J.A. 916. According to Coleman, he immediately told Phillips that he actually did not have a juvenile criminal record and explained that "it had been expunged or dismissed [by] Judge Trompeter." *Id.* Coleman also "specifically remember[ed] saying to [Phillips] how could I have enlisted in any sort of armed forces with a criminal history." *Id.* at 916-17.

Called by the Commonwealth as its sole witness, Phillips then confirmed that he had had conferred with Coleman about the Presentence Investigation Report. Asked on direct examination whether Coleman told Phillips at the time that Coleman's "juvenile convictions had been expunged," Phillips responded that Coleman "may have" but that Phillips did not "remember that specifically," as "it was five or six years ago." *See* J.A. 920. Phillips also suggested that he easily could have dismissed any claim of expungement, in that he had "a lot of clients who[,] when they're sentenced as adults[,] [incorrectly] believe that their juvenile record is expunged automatically when they turn 18." *Id.* In any

---

witnessing of the "horrible and tragic" death of their close friend Sergeant Eric Newman, and the effect Newman's death had on both of them. *Id.* (sharing, inter alia, that Colson and Coleman would sometimes "just sit together and cry" and were left "angry, scared, and feeling so many emotions all at once that it felt impossible to control it").

event, Phillips emphasized that he was "not going to say that [Coleman was] not telling the truth" about informing Phillips of the expungement; rather, Phillips reiterated that he simply "d[id]n't remember." *Id.*

On cross-examination, Coleman's habeas corpus counsel elicited that Phillips "believe[d]" he spoke by telephone with Coleman's stepfather Alex Biles while preparing for the sentencing hearing but did not "remember the specifics of it." *See* J.A. 921. Phillips did recall speaking with Colonel James Gaylord and commented that he "was impressed with what [Gaylord] said about Mr. Coleman." *Id.* at 921-22. Elaborating, Phillips recounted that Gaylord "[s]aid that he would put [Coleman] in the top one percent of all soldiers that he's had under him and that he wanted Mr. Coleman as his personal bodyguard and would trust him with his life." *Id.*; *cf. id.* at 307-08 (Phillips's consistent, but much blander, remark during the sentencing hearing that he had been in touch with Gaylord, "who would relay to the Court that [Coleman] was an excellent soldier" and that there had once been a plan "for him to come back [to Afghanistan] to be [a] personal security guard for [Gaylord] again"). With no further questions from either side about his performance as Coleman's lawyer, the testimony of Phillips — and the July 2017 evidentiary hearing — then came to an end.

### 3.

In written submissions to the presiding judge following the July 2017 evidentiary hearing in the state habeas corpus proceedings, Sergeant Coleman delineated why he is entitled to plenary resentencing on his Sixth Amendment ineffective assistance of counsel claim. Coleman's submissions included a nearly identical pair of proposed findings of fact

54

and conclusions of law — each spanning 44 pages — with one filed in the Circuit Court for the City of Roanoke and the other filed in the Circuit Court for the County of Roanoke. Therein, Coleman asserted that he established both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense," as required under the two-prong standard for ineffective assistance claims explained by the Supreme Court in its seminal decision in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

a.

The crux of Sergeant Coleman's theory of deficient performance was that his defense counsel Gregory Phillips inexcusably failed to counter the depiction of Coleman advanced by the prosecutors at sentencing — that is, the portrayal of Coleman as a liar (primarily based on his purported lies to the probation officer and Army recruiters that he did not have a juvenile criminal record, along with his unsubstantiated claims of combat-related traumatic brain injuries and PTSD); as a forever violent and compassionless person (premised on the general fact of his juvenile criminal record, the notion that he was a bad child despite a good childhood, his apparent squandering of opportunities for rehabilitation and mental health treatment, and his supposed use of the Army as an outlet for innate violence and cruelty); and as fully culpable and remorseless for his crimes (based on the lack of any explanation for his conduct and the arguable insincerity of his claims of remorse).

Indeed, as Coleman emphasized, Phillips did not just passively allow that depiction. Rather, Phillips actively agreed to much of it. For example, in addition to lodging no objection to the judge's consideration of Coleman's juvenile criminal record, Phillips led

55

Coleman to confirm, at the outset of his testimony during the August 2012 sentencing hearing, that he "did have a juvenile criminal record." *See* J.A. 263. In the subsequent closing arguments, even after Coleman had raised the issue of expungement on cross-examination, Phillips underscored that Coleman "admitted the issues he had criminally as a juvenile." *Id.* at 314. Furthermore, Phillips not only made no effort to promote Coleman's testimony about his combat injuries or to draw a connection between those injuries and his criminal conduct of March 17, 2011, but expressly conceded that there was "no excuse for what [Coleman] did." *Id.* at 316. The only mitigating factors proffered by Phillips in the closing arguments were Coleman's (largely uncorroborated) testimony about his "two (2) years of combat duty for our country" and his (arguably insincere) admission that "what he did was wrong." *Id.*

Drawing on the habeas corpus evidence, Coleman identified what Phillips instead should have — and easily could have — done. That included:

- Preventing the sentencing judge's improper consideration of Coleman's juvenile criminal record by obtaining and presenting readily available evidence that all juvenile criminal charges against Coleman had been dismissed and that his juvenile criminal record had been fully expunged, as well as by objecting to the record's use by the prosecutors to impeach Coleman and by the probation officer to increase his sentencing guidelines range;

- Obtaining and presenting readily available evidence tending to humanize Coleman and contradicting the notion that he was then and had always been a violent and compassionless person, such as:

  - Witness testimony and school, social services, and (to the extent they could have been properly considered) juvenile criminal records reflecting that Coleman suffered terrible childhood abuse and resulting mental health and substance abuse problems, and that he yet

56

was widely known to be kind and nonviolent to others and a threat only to himself, and he embraced the services and treatment accorded him as a teenager and successfully transitioned into being a responsible and self-sufficient adult;

- Witness testimony and military records reflecting that — far from being an outlet for unjustified violence and cruelty — Coleman's Army service was exceptionally honorable and valorous under extremely difficult circumstances; and

- Witness testimony describing the dramatic negative changes in Coleman's behavior upon his return to the United States from Afghanistan in early 2011;

● Obtaining and presenting readily available medical records that corroborated and elaborated on the combat injuries that Coleman had sustained in Afghanistan, including his two traumatic brain injuries and his ensuing struggles with PTSD; and

● Obtaining and presenting a psychological evaluation of Coleman that would have provided important insight into his offenses of March 17, 2011, by tying his traumatic brain injuries and PTSD to his subsequent substance abuse and criminal conduct.

Coleman also indicated that Phillips should have challenged the Presentence Investigation Report's erroneous statement that Coleman had shot victim Mary Cook-Moore three times, but Coleman abandoned that aspect of his claim after expressing satisfaction that the parties and the judge now all agreed that Cook-Moore was actually shot once.

In support of his theory of deficient performance, Coleman cited the Virginia statute providing for the expungement of juvenile court records. *See* Va. Code § 16.1-306. He also invoked Virginia authorities "hold[ing] that a prosecutor may not impeach the defendant with evidence of prior juvenile adjudications." *See Lavinder v. Commonwealth*,

57

395 S.E.2d 211, 212 (Va. Ct. App. 1990) (relying on *Kiracofe v. Commonwealth*, 97 S.E.2d 14, 21 (Va. 1957)).

More fundamentally, Coleman invoked relevant precedents of the Supreme Court of the United States. Among them, *Penry v. Lynaugh* recognized "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *See* 492 U.S. 302, 319 (1989) (internal quotation marks omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). And *Porter v. McCollum* recognized defense counsel's obligation, in preparing for sentencing, "'to conduct a thorough investigation of the defendant's background'" for mitigating evidence, with the basic "first step" being "interviewing witnesses" and "requesting records." *See* 558 U.S. 30, 39 (2009) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). The *Porter* decision reflects that there is no deficient performance "when counsel gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources," but there is deficient performance when counsel unreasonably failed "to conduct *some* sort of mitigation investigation" or otherwise "ignored pertinent avenues for investigation of which he should have been aware." *Id.* at 39-40.

Coleman analogized his case to the *Porter* defendant's, in that Porter's counsel failed to investigate and present mitigating evidence at sentencing, including evidence of Porter's "abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity."

58

*See Porter*, 558 U.S. at 33. The *Porter* Court deemed counsel's performance to be deficient, emphasizing that — despite having been tipped off by, e.g., pretrial competency evaluations that it could have been fruitful to do so — the lawyer failed to even "obtain any of Porter's school, medical, or military service records or interview any members of Porter's family." *Id.* at 39-40.

Coleman asserted that, in his case, defense counsel Phillips was put on notice by the Presentence Investigation Report and his communications with several of Coleman's supporters — including his stepfather Alex Biles, second wife Alexis Mooney, and commanding officer Colonel James Gaylord — that Coleman's school and other juvenile records, military records, and medical records potentially contained a wealth of mitigating evidence and that there were many witnesses who could appear on his behalf. Moreover, the records were easily obtainable and the witnesses available and willing to testify. Nevertheless, like the lawyer in *Porter*, Phillips undertook virtually no investigation at all, failing to take even the basic step of requesting records and interviewing Coleman's already-known supporters. As such, Coleman contended, Phillips's performance was just as patently deficient as the *Porter* lawyer's.

b.

Turning to his theory of prejudice, Sergeant Coleman expressly and correctly stated his burden under the Supreme Court's *Strickland* decision, i.e., that he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. Coleman also quoted *Strickland*'s definition of a "reasonable probability" as being "a probability

59

sufficient to undermine confidence in the outcome." *See id.* And he explained that *Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered." *See Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (per curiam) (citing *Strickland*, 466 U.S. at 693).

Furthermore, Coleman again invoked the Supreme Court's *Porter* decision, now as a model of the proper *Strickland* prejudice analysis. In *Porter*, where Porter's counsel was deficient in failing to investigate and present mitigating evidence at sentencing, the Court recognized that Porter was required to "show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." *See Porter*, 558 U.S. at 41. "To assess that possibility," the Court specified that it was obliged to "consider 'the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding' — and 'reweigh it against the evidence in aggravation.'" *Id.* (alteration omitted) (quoting *Williams*, 529 U.S. at 397-98).

The *Porter* Court went on to deem counsel's deficient performance to be prejudicial, observing that Porter's case was not one "in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge.'" *See Porter*, 558 U.S. at 41 (quoting *Strickland*, 466 U.S. at 700). The Court explained that whereas Porter's sentencing judge and jury had "heard almost nothing that would humanize Porter or allow [the judge and jury] to accurately gauge [Porter's] moral culpability," the new evidence revealed "the 'kind of troubled history we have declared relevant to assessing a defendant's moral culpability,'" particularly with regard to Porter's abusive childhood, heroic and trauma-inducing wartime military service, subsequent struggles to regain normality, and

60

long-term impairments in his mental health and mental capacity. *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (citing *Penry*, 492 U.S. at 319)). Considering the totality of the mitigating evidence — consisting mostly of the new evidence — and reweighing it against the evidence in aggravation, the Court concluded that there was "clearly a reasonable probability" of a different sentence. *Id.* at 42.

Notably, Coleman characterized his case for prejudice as being even more compelling than the *Porter* defendant's, mainly because what little mitigating evidence was presented at Coleman's sentencing hearing ended up being used against him. Coleman highlighted that the limited and uncorroborated evidence of his juvenile history, military service, and combat injuries allowed the prosecutors to paint him as a liar, as a forever violent and compassionless person, and as fully culpable and remorseless for his crimes. Importantly, Coleman further emphasized that the prosecutors' depiction of him — which Coleman termed a "false narrative" — was then largely adopted by the sentencing judge. As the judge explicitly stated during the sentencing hearing, Coleman's sentence was premised not only on the "horrific[ness]" of his March 17, 2011 offenses, but also on his lifelong and abnormal lack of "compassion and caring for others," the apparent disingenuousness of his claims of remorse, and the lack of any explanation for how his crimes "could have possibly occurred" on the highly aggravating single-day timeline. *See* J.A. 319-22. To the extent that the judge accepted that Coleman's military service was "commendable" and "entirely lawful," the judge did not deem that military service to be significant enough to be worthy of any mitigating weight. *Id.* at 320-21.

61

Additionally, Coleman underscored that the improper and unchallenged use of his expunged juvenile criminal record not only furthered the prosecutors' false narrative, but also enabled the probation officer to erroneously increase his sentencing guidelines range. In that regard, Coleman asserted that although the sentencing judge ultimately settled on a sentence exceeding its high end, the miscalculated guidelines range served as an inaccurate and unfair benchmark for the sentence to be imposed.

Under Coleman's theory of prejudice, there was a reasonable likelihood of a different sentence but for his defense counsel Gregory Phillips's failures to contest the improper use of the expunged juvenile criminal record and to otherwise counter the prosecutors' false narrative with readily available mitigating evidence such as that presented in the state habeas corpus proceedings. In other words, as in *Porter*, considering the totality of the mitigating evidence — consisting mostly of the new evidence — and reweighing it against the evidence in aggravation, there was "clearly a reasonable probability" of a different sentence. *See Porter*, 558 U.S. at 42. Accordingly, Coleman insisted that he was entitled to state habeas corpus relief in the form of plenary resentencing.

4.

Of course, the presiding judge rejected Sergeant Coleman's arguments in the state habeas corpus proceedings. Instead, the judge credited the Commonwealth's counterarguments and directed the Commonwealth to craft a pair of proposed orders, which the judge thereafter adopted *in haec verba*. The first of those 15-page orders was entered in the Circuit Court for the County of Roanoke on May 16, 2018, and its nearly identical

62

counterpart was entered in the Circuit Court for the City of Roanoke on May 18, 2018.[8] For reasons that will become apparent, we cite herein the Circuit Court for the City of Roanoke order, which we sometimes refer to as the "State Decision."

The State Decision, as crafted by the Commonwealth and adopted by the judge, characterized Coleman's petitions as asserting three distinct claims of Sixth Amendment ineffective assistance of counsel:  "Claim A," for failure "to request an evaluation of [Coleman's] mental state in preparation for [his] sentencing"; "Claim B," for failure "to present [Coleman's] medical records at sentencing" and "to obtain a continuance to do so"; and "Claim C," for failure "to introduce the sentencing court to more than a cursory view of Coleman." *See* State Decision 2.  From there, the State Decision provided separate discussions of Claims A, B, and C, each containing findings of fact concerning select pieces of the habeas corpus evidence.

Addressing the habeas corpus evidence with respect to Claim A, the State Decision identified the January 6, 2015 affidavit of Dr. JoEllen Salce Rogers and the January 29, 2016 declaration of Dr. Victoria Reynolds, both based on reviews of Coleman's available records.  The State Decision did not, however, acknowledge Dr. Rogers's psychological evaluation of March 13, 2015, which augmented her earlier affidavit and involved an interview of Coleman.

---

[8] The Circuit Court for the County of Roanoke order is found at J.A. 927-41, and the Circuit Court for the City of Roanoke order is found at J.A. 942-56.

The State Decision criticized the Rogers affidavit on the ground, inter alia, that "[t]his expert had not examined or interviewed Coleman" — wholly ignoring Dr. Rogers's subsequent interview-based evaluation of Coleman. *See* State Decision 2. The State Decision then criticized the Reynolds declaration for failing to "address military PTSD, except to cite Dr. Rogers' opinion" — disregarding the fact that Dr. Reynolds adopted the combat-related PTSD diagnosis made by Dr. Rogers in her interview-based evaluation. *Id.* at 3. Additionally, the State Decision criticized Dr. Reynolds for, inter alia, "merely review[ing] [Coleman's] records" and opining on "alleged childhood PTSD based on parental abuse" while admitting that "'none of the records fully assess, document, and describe the entirety of [a young Coleman's] possible traumatic experiences.'" *Id.* (quoting J.A. 841).

The State Decision also questioned the qualifications of Drs. Rogers and Reynolds and rejected any notion that their opinions were bolstered by the diagnoses made during Coleman's hospitalization at the Lewis-Gale Center for Behavioral Health in the immediate aftermath of his March 17, 2011 offenses, construing that "[a]lthough the discharge diagnosis in the Lewis-Gale records does mention post-traumatic stress disorder, the primary Axis I findings were 'Alcohol dependence, Opioid dependence.'" *See* State Decision 4 (quoting J.A. 504). Indeed, the State Decision raised doubts that Coleman actually suffered from PTSD at all, in that it repeatedly referred to "alleged PTSD" and highlighted evidence such as Coleman's acknowledgment in his sentencing hearing testimony "that if he had informed his superiors of his [mental health] problems, they

would not 'have turned [him] away.'" *Id.* at 6 (second alteration in original) (quoting J.A. 292).

On Claim A, the State Decision ultimately found that "Coleman has presented no evidence showing the connection between the alleged PTSD and his criminal conduct." *See* State Decision 6. Rather, the State Decision found that "Coleman's crimes displayed drunken and drug-induced misbehavior not connected with any dissociative condition, sensation-seeking syndrome or depression-suicide syndrome, the 'three common PTSD claims in the criminal justice system.'" *Id.* (citing no source or authority for the quoted proposition). Remarking that there was no explanation in the Rogers affidavit or the Reynolds declaration as to how "Coleman's alleged PTSD caused him to terrorize and shoot his female victim or resulted in the brutal and vicious unprovoked assault on a customer in a bar," the State Decision found that "[t]hese acts are more clearly explained by Coleman's substance abuse and his prior history of bad behavior." *Id.* at 6-7.

Turning to Claim B, the State Decision discussed the medical records introduced in the state habeas corpus proceedings, including the military medical records documenting Coleman's injuries in the January 19, 2011 Kandahar rocket attack and the Lewis-Gale records of Coleman's hospitalization in the immediate aftermath of his March 17, 2011 offenses. The State Decision emphasized the notations in the military medical records of January 20, 2011, that a CT scan of Coleman's head showed "'[n]o abnormal foci'" and "'[n]o acute intracranial process'" — as well as similar notations in the Lewis-Gale records — all of which the State Decision found to be indicative of "a normal neurological examination." *See* State Decision 7-8 (quoting J.A. 487). According to the State Decision,

65

the military and Lewis-Gale records "show no evidence of physical injuries and, to the extent that they show any PTSD, that condition is less significant than the finding of substance abuse." *Id.* at 8. The State Decision therefore found that "the records would [not] have been helpful to [Coleman]." *Id.*

As for Claim C, relating to the failure to introduce more than a cursory view of Coleman at sentencing, the State Decision discussed only habeas corpus evidence concerning Coleman's juvenile history, and not any of the witness testimony regarding his subsequent military service or the marked changes in his behavior following his return to the United States from Afghanistan in early 2011. Specifically, the State Decision identified the evidence pertinent to Claim C as being "numerous exhibits about Coleman's juvenile placements, treatment and mental illnesses[,] and his father's mental health and criminality," including "contacts with social services, juvenile probation agencies, [and] juvenile facilities and hospitals." *See* State Decision 9. The State Decision suggested, however, that such evidence was unhelpfully duplicative of information contained in Coleman's Presentence Investigation Report. That is, the State Decision highlighted that the Report "did discuss the placements" and "Coleman's mental health history" and "hospitalizations for various problems," and that the Report also "advised . . . that Coleman's father, who was then in prison, had a history of burglary and sex crimes, was a registered sex offender[,] and had a mental health and substance abuse history." *Id.*

The State Decision also advanced other reasons why the habeas corpus evidence of Coleman's juvenile history would have unhelpful to him at sentencing, including that the juvenile records contained "consistent findings of substance-abuse arising again and again

66

in that history"; that the records established that Coleman's substance abuse was "self-induced" and that his "mental problems" were in turn "drug induced"; and that the records and witness testimony "revealed a good relationship between Coleman and his step-father" and "present a mother who was very supportive." *See* State Decision 10-13. At one point, the State Decision asserted that Coleman somehow "conceded" during the sentencing hearing "that he had problems with violent behavior," based on his testimony that he joined the Army because "'he didn't want to live that life' and 'didn't want to be a part of that.'" *Id.* at 12 (paraphrasing Coleman's testimony). At another point, the State Decision allowed that "the testimony and the records as a whole may show that Coleman was likeable and non-violent," but the State Decision then asserted that was true only when Coleman "was not abusing drugs or alcohol," in that "his substance abuse caused problems within his family and community which led to numerous contacts with the courts, juvenile placements and hospitalizations." *Id.* at 12-13.

In its discussion of Claim C, the State Decision briefly addressed Coleman's contention that his expunged juvenile criminal record was improperly considered at sentencing. The State Decision pointed out that because the habeas corpus evidence "inextricably address[es] [Coleman's] contacts with the juvenile justice system and make[s] reference to juvenile delinquency charges," that evidence could not have been presented at the sentencing hearing "without revealing his history of interaction with the juvenile courts." *See* State Decision 9. Moreover, regarding the use of the juvenile criminal record to increase Coleman's sentencing guidelines range, the State Decision emphasized the judge's imposition of an above-guidelines sentence and explanation that

67

"'this case cannot be judged under the guidelines . . . because . . . the aggravated circumstances are just beyond the pale of the guidelines [and] [t]he guidelines couldn't possibly encompass the facts that are present here.'" *Id.* at 13 (first alteration in original) (quoting J.A. 322-23).

It bears mentioning that, throughout its discussions of Claims A, B, and C, the State Decision suggested that Coleman himself was to blame for his lawyer's failure to present at least some of the habeas corpus evidence at sentencing. Specifically, the State Decision repeatedly noted that "[t]here is no evidence that Coleman told his lawyer about any [childhood] abuse" and that he "instead told the probation officer that he had had a good childhood." *See* State Decision 4; *see also id.* at 9, 12. The State Decision also recited that "Coleman told the probation officer that he had 'no medical difficulties as a result of [his combat] injuries.'" *Id.* at 5 (quoting J.A. 536).

In any event, the State Decision's final conclusions of law turned on the issue of prejudice, and not on the issue of deficient performance. For each of Claims A, B, and C, the State Decision concluded that there was no prejudice because the habeas corpus evidence "would not have" changed Coleman's sentence. On Claim A, relating to the failure to obtain an evaluation of Coleman's mental state, the State Decision ruled that such an evaluation "*would not have* produced a different result at sentenc[ing] and thus Coleman has not shown any prejudice." *See* State Decision 13 (emphasis added).

On Claim B, relating to the failure to present medical records, the State Decision first ruled "that Coleman's history of substance abuse and his substance abuse at the times of his crimes would have exacerbated his liability." *See* State Decision 13. In support of

that ruling, the State Decision pronounced "that the introduction of records showing drug use is always a double-edged sword." *Id.* (citing *Lewis v. Warden*, 645 S.E.2d 492, 505-06 (Va. 2007)). The State Decision then ruled that the introduction of the military medical records and Lewis-Gale records "*would not have* produced a different outcome at sentencing." *Id.* (emphasis added).

Finally, the State Decision ruled on Claim C, relating to the failure to introduce more than a cursory view of Coleman. In the words of the State Decision, "the introduction of additional medical, social service, school and psychological records with respect to Coleman's childhood *would not have* resulted in a different outcome at sentencing." *See* State Decision 14 (emphasis added).

It was only then that the State Decision finally mentioned the Supreme Court's seminal *Strickland* decision. The sum total of the State Decision's discussion of *Strickland* was as follows:

> Thus, under the criteria set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), [Coleman] has not shown that his attorney's actions or omissions prejudiced [him]. As a result, [Coleman] has not proven that his attorney was ineffective. Therefore, all claims should be dismissed.

*See* State Decision 14. So, the State Decision concluded that Coleman's ineffective assistance claims failed for lack of *Strickland* prejudice, without unnecessarily deciding the issue of *Strickland* deficient performance. In other words, the State Decision ruled that any deficient performance was not prejudicial.

The State Decision therefore "denied and dismissed" Coleman's respective petitions for state habeas corpus relief. *See* State Decision 14. And the State Decision did so without

69

spelling out "the criteria set forth in *Strickland*," without citing any other authority, and without discussing the many additional precedents that had been invoked by Coleman, including *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam).

\* \* \*

In early June 2018, Sergeant Coleman's counsel Jonathan Sheldon noted appeals to the Supreme Court of Virginia from both orders denying state habeas corpus relief. By decision of November 20, 2018, the state supreme court dismissed the appeal from the order that had been filed in the Circuit Court for the County of Roanoke on March 16, 2018, on the ground that the petition for appeal was not timely filed. A subsequent request for a rehearing of that decision was denied on February 1, 2019. Thereafter, by decision of April 1, 2019, the state supreme court refused the appeal from the order that had been filed in the Circuit Court for the City of Roanoke on March 18, 2018 — i.e., the State Decision — assessing the merits of that order and summarily ruling that it contained no reversible error.[9]

E.

Having thereby exhausted his state court remedies, Sergeant Coleman filed a single petition for habeas corpus relief under 28 U.S.C. § 2254 in the federal district court for the Western District of Virginia on May 23, 2019. In these federal habeas corpus proceedings,

---

[9] Sergeant Coleman's 28 U.S.C. § 2254 petition reflects that his counsel Jonathan Sheldon mistakenly believed that both orders had been filed on March 18, 2018, leading to the timely appeal from the Circuit Court for the City of Roanoke order but the untimely appeal from the Circuit Court for the County of Roanoke order.

Coleman remains represented by lawyer Jonathan Sheldon and the Commonwealth by the Attorney General of Virginia. Coleman's § 2254 petition asserts the same Sixth Amendment ineffective assistance of counsel claim that he pursued in the state habeas corpus proceedings, based on the prejudicially deficient performance of defense counsel Gregory Phillips in the consolidated sentencing proceedings in the Circuit Courts for the City and County of Roanoke.

The Commonwealth answered Coleman's § 2254 petition by moving for the petition's dismissal. In support of its motion to dismiss, the Commonwealth first contended that insofar as Coleman challenges the order of the Circuit Court for the County of Roanoke denying state habeas corpus relief, the § 2254 petition is procedurally barred both because of the untimely filing of his appeal in the Supreme Court of Virginia and because of the further untimely filing of the § 2254 petition in the federal district court. Next, the Commonwealth argued that insofar as Coleman challenges the nearly identical order of the Circuit Court for the City of Roanoke — the State Decision — the § 2254 petition is not procedurally barred but fails on the merits.

In response, Coleman conceded the untimeliness of his challenge to the Circuit Court for the County of Roanoke order, asserting that it was "of no import" because his timely challenge to the Circuit Court for the City of Roanoke order involves the same consolidated sentencing proceedings, the same combined sentence, and the same Sixth Amendment ineffective assistance of counsel claim. *See* J.A. 177-78. Coleman then countered the Commonwealth's substantive defense of the Circuit Court for the City of Roanoke order, concomitantly reiterating the § 2254 petition's contentions as to why the

71

State Decision was "both wrong and unreasonable" in rejecting his ineffective assistance claim. *Id.* at 178-86.

By its memorandum opinion and separate order of June 15, 2020, the federal district court dismissed Coleman's § 2254 petition for being untimely as to the Circuit Court for the County of Roanoke order and for being non-meritorious as to the Circuit Court for the City of Roanoke order. *See Coleman v. Clarke*, No. 7:19-cv-00386 (W.D. Va. June 15, 2020), ECF Nos. 13 & 14. In its merits ruling, the district court reached only the issue of *Strickland* prejudice, without unnecessarily considering the issue of *Strickland* deficient performance. With respect to *Strickland* prejudice, the court concluded that Coleman failed to demonstrate that the State Decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts," as required for federal habeas corpus relief. *See* 28 U.S.C. § 2254(d)(1)-(2). The court also denied a certificate of appealability, or "COA," as needed by Coleman to appeal from the court's dismissal of the § 2254 petition. *See id.* § 2253(c)(1)(A) (providing that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court").

Coleman thereafter noted this appeal and sought a COA from our Court. On February 17, 2022, we granted Coleman a COA as to the following merits issues with respect to his Sixth Amendment ineffective assistance of counsel claim:

(1)     Whether the district court properly denied relief on Coleman's claim that counsel rendered ineffective assistance by failing to sufficiently investigate, seek, obtain, and produce evidence to present on Coleman's behalf at sentencing, or by failing to seek a continuance to adequately prepare; and

(2)     Whether the district court properly denied relief on Coleman's claim that counsel rendered ineffective assistance by failing to object to the probation officer's inclusion of Coleman's expunged juvenile criminal record in the presentence report and the Commonwealth's use of Coleman's juvenile adjudications to impeach Coleman.

*See Coleman v. Dotson*, No. 20-7083 (4th Cir. Feb. 17, 2022), ECF No. 9.  Having conceded the timeliness issue in the district court, Coleman did not seek a COA as to that procedural question.

## II.

Our review of a federal district court's denial of a state prisoner's 28 U.S.C. § 2254 petition is de novo, conducted on the basis of the state court record.  *See Tucker v. Ozmint*, 350 F.3d 433, 438 (4th Cir. 2003).  Under § 2254, a state prisoner may petition a federal court for a writ of habeas corpus, provided the petitioner contends that he is in custody in violation of the Constitution, laws, or treaties of the United States.  *See* 28 U.S.C. § 2254(a).

Following the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant § 2254 relief with respect to any claim adjudicated on the merits in state court unless the underlying state adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

73

(2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d)(1)-(2).  Additionally, AEDPA directs that state court factual determinations are presumed to be correct and that the presumption of correctness is rebuttable only by clear and convincing evidence.  *Id.* § 2254(e)(1).  AEDPA thereby places a heavy burden on § 2254 petitioners and provides for a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *See Tyler v. Hooks*, 945 F.3d 159, 165-66 (4th Cir. 2019) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

## III.

Although we are fully mindful of and faithful to the highly deferential AEDPA standard, we conclude that Sergeant Coleman is entitled to habeas corpus relief under 28 U.S.C. § 2254 on his Sixth Amendment ineffective assistance claim.  We explain our decision below.

### A.

At the outset, we clarify that in our de novo review of the federal district court's denial of Sergeant Coleman's 28 U.S.C. § 2254 petition, we specifically address the order of the Circuit Court for the City of Roanoke denying habeas corpus relief.  It is our focus — and we therefore call it the "State Decision" — because there is no timeliness issue with respect to that order, unlike the nearly identical order of the Circuit Court for the County

74

of Roanoke, and because it constitutes the "last reasoned decision" of the state courts, having been summarily affirmed on its merits by the Supreme Court of Virginia. *See Woodfolk v. Maynard*, 857 F.3d 531, 544 (4th Cir. 2017) ("To determine the basis upon which a state court rejected a habeas claim, a federal habeas court must look through any intervening summary decisions to the last reasoned decision of a state court addressing the claim." (internal quotation marks omitted)).[10]

In any event, we agree with Coleman — as he asserted in the federal district court — that the lack of a timely challenge to the Circuit Court for the County of Roanoke order is "of no import," in that his timely challenge to the Circuit Court for the City of Roanoke order involves the same consolidated sentencing proceedings, the same combined sentence, and the same Sixth Amendment ineffective assistance of counsel claim. *See* J.A. 177-78. The sentencing judge himself explicitly confirmed, at the time the sentence was imposed, that he assessed as "a whole" Coleman's criminal conduct of March 17, 2011, rather than separating the offense committed in the City of Roanoke from those committed in Roanoke

---

[10] We observe that although the State Decision was crafted by the Commonwealth and then adopted by the presiding judge *in haec verba*, it "is unquestionably an adjudication by the state court entitled to the deferential review mandated by 28 U.S.C. § 2254(d)." *See Elmore v. Ozmint*, 661 F.3d 783, 829 & n.24 (4th Cir. 2011) (internal quotation marks omitted) (applying the § 2254(d) standard to a state decision that was "almost identical to the proposed order submitted by the State and adapted from its own brief" and that even "occasionally refer[red] to itself as a 'Brief'"). That being said, we repeat what we have emphasized many times before: "though we are sympathetic about the substantial caseloads facing state trial judges, there are serious problems with this practice." *See Burr v. Jackson*, 19 F.4th 395, 407 (4th Cir. 2021) (citing variety of cases). Count this as yet another instance in which we "strongly criticize the practice of verbatim (or close-to-verbatim) adoption of proposed opinions." *Id.* (internal quotation marks omitted).

County. *Id.* at 319. Consistent therewith, the Commonwealth now simply urges us to deny Coleman any relief at all, without asking us to limit any relief to the sentence for the City of Roanoke offense.

This case thus calls to mind the federal "sentencing package doctrine," which "accounts for the holistic approach that a district court should employ when sentencing a defendant convicted of multiple offenses." *See United States v. Ventura*, 864 F.3d 301, 309 (4th Cir. 2017) (citing *United States v. Fowler*, 749 F.3d 1010, 1015 (11th Cir. 2014), for the proposition that "sentencing on multiple counts is an inherently interrelated, interconnected, and holistic process which requires a court to craft an overall sentence"). Pursuant to the sentencing package doctrine, upon the vacatur of any portion of a sentence that was imposed for multiple offenses, "the sentence becomes void in its entirety and the district court is free to revisit any rulings it made at the initial sentencing." *Id.* (internal quotation marks omitted). Similarly, Coleman is entitled to plenary resentencing not only on his conviction in the Circuit Court for the City of Roanoke, but also on his convictions in the Circuit Court for the County of Roanoke.

### B.

That brings us to our assessment of the State Decision under the deferential standards of 28 U.S.C. § 2254(d). We are particularly concerned with § 2254(d)(1) and the question of whether the State Decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). "In the context of § 2254(d)(1), 'clearly established Federal law' refers to governing legal principles set forth by the Supreme Court

76

at the time the state court rendered its decision." *See Witherspoon v. Stonebreaker*, 30 F.4th 381, 393 (4th Cir. 2022).

Here, of course, such principles are drawn from the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), explaining the two-prong standard for Sixth Amendment ineffective assistance of counsel claims. Pursuant to that standard, the defendant must demonstrate both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *See Strickland*, 466 U.S. at 687. "A sufficient showing on both points evinces 'a breakdown in the adversary process that renders the result unreliable.'" *See Witherspoon*, 30 F.4th at 393 (quoting *Strickland*, 466 U.S. at 687). We rule for Sergeant Coleman on each prong, as is necessary for the award of § 2254 relief.

1.

Although the State Decision turned on the issue of prejudice, we begin with the issue of deficient performance. Under *Strickland*'s deficient performance prong, the defendant must demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *See Strickland*, 466 U.S. at 687. To do so, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," with "[t]he proper measure of attorney performance" being "simply reasonableness under prevailing professional norms." *Id.* at 688. Generally, "[j]udicial scrutiny of counsel's performance must be highly deferential," and there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," including that "the challenged

77

action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted).

Owing to the deference accorded to state decisions under 28 U.S.C. § 2254(d)(1) and the deference accorded to counsel under *Strickland*, the federal courts are often obliged to engage in a "doubly deferential" review of the deficient performance issue with respect to ineffective assistance claims brought pursuant to § 2254. *See Valentino v. Clarke*, 972 F.3d 560, 580 (4th Cir. 2020) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2016)). Here, however, the State Decision did not decide the deficient performance issue, and thus we have no ruling to defer to and must perform a de novo analysis. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*.").

Moreover, it is undisputed that Sergeant Coleman's counsel failed without justification to conduct a thorough mitigation investigation, thereby rebutting the presumption of sound trial strategy and other reasonable professional assistance. By his affidavit submitted in the state habeas proceedings, the lawyer admitted at least some of his ineptitude. Furthermore, the Commonwealth affirmatively conceded during the oral argument before our Court that the lawyer's performance was deficient. We accept the Commonwealth's concession, for it is supported by *Strickland* and its binding progeny, including *Porter* and other Supreme Court decisions that have been invoked by Coleman in the state and federal habeas corpus proceedings.

78

As the Supreme Court has explained, defense counsel is generally obliged prior to sentencing "'to conduct a thorough investigation of the defendant's background'" for mitigating evidence, with the basic "first step" being "interviewing witnesses" and "requesting records." *See Porter*, 558 U.S. at 39 (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). Any decision not to investigate or to limit an investigation "must be directly assessed for reasonableness in all the circumstances." *See Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (quoting *Strickland*, 466 U.S. at 691). Hence, there is no deficient performance "when counsel gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources," but there is deficient performance when counsel unreasonably failed "to conduct *some* sort of mitigation investigation" or otherwise "ignored pertinent avenues for investigation of which he should have been aware." *See Porter*, 558 U.S. at 39-40.

Coleman has understandably analogized his case to the *Porter* defendant's in particular, in that both here and there, defense counsel failed to investigate and present mitigating evidence of childhood abuse, heroic wartime military service, resultant trauma, substance abuse, and mental health struggles. *See Porter*, 558 U.S. at 33. Moreover, despite having reason to know that it could have been fruitful to do so — based on, e.g., the pretrial competency evaluations in *Porter* and the Presentence Investigation Report and communications with several of Coleman's supporters in this case — counsel failed to even obtain any school or other juvenile records, military records, or medical records or to interview family members or other potential witnesses. *See id.* at 39-40.

79

In its own de novo analysis of the deficient performance issue in *Porter*, the Supreme Court easily deemed the performance of Porter's counsel to be deficient, observing that counsel "clearly" failed to satisfy his "obligation to conduct a thorough investigation of [Porter's] background" and that "[t]he decision not to investigate did not reflect reasonable professional judgment." *See Porter*, 558 U.S. at 39-40 (internal quotation marks omitted). *Porter* cited previous Supreme Court decisions reaching similar conclusions. *See, e.g.*, *Williams*, 529 U.S. at 396 (concluding that counsel's failure to introduce voluminous mitigating evidence at sentencing "was not justified by a tactical decision to focus on Williams' voluntary confession," because "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); *Wiggins*, 539 U.S. at 534 (concluding that although counsel conducted some investigation, "[t]heir decision to end their investigation when they did was neither consistent with the professional standards that prevailed [at the time], nor reasonable in light of the evidence counsel uncovered"). Further pertinent authority has been issued by the Court since. *See, e.g.*, *Andrus v. Texas*, 590 U.S. 806, 814 (2020) (per curiam) (concluding that "counsel fell short of his obligation in multiple ways," including by "perform[ing] almost no mitigation investigation" and thereby "overlooking vast tranches of mitigating evidence" and having "what little evidence counsel did present backfire[] by bolstering the State's aggravation case").

We now similarly conclude that the performance of Coleman's lawyer was deficient, in that he "clearly" failed to satisfy his "obligation to conduct a thorough investigation of [Coleman's] background" and that "[t]he decision not to investigate did

80

not reflect reasonable professional judgment." *See Porter*, 558 U.S. at 39-40 (internal quotation marks omitted). In so ruling, we note that we have considered the State Decision's suggestion that Coleman himself was to blame for his lawyer's failure to present at least some of the habeas corpus evidence at sentencing, in that Coleman reported no childhood abuse to the lawyer and reported a good childhood and a lack of post-combat-injury medical difficulties to the probation officer. We are satisfied that the lawyer was not somehow relieved of his obligation to conduct a thorough mitigation investigation, particularly in light of the limited information provided by the probation officer in Coleman's Presentence Investigation Report and the many unanswered questions raised by the Report about Coleman's juvenile history, military service, combat injuries, substance abuse, and mental health struggles. *Cf. Porter*, 558 U.S. at 40 (observing that although "Porter may have been fatalistic or uncooperative," that did "not obviate the need for defense counsel to conduct *some* sort of mitigation investigation"); *Wiggins*, 539 U.S. at 524-25 (ascertaining deficient performance based on "[c]ounsel's decision not to expand their investigation beyond the [presentence investigation report] and [social services] records").

### 2.

We next address the issue of prejudice, i.e., the issue on which the State Decision turned. Under *Strickland*'s prejudice prong, the defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. Such a "reasonable probability" of a change in result is one that is "sufficient to undermine

81

confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *See Harrington v. Richter*, 562 U.S. 86, 112 (2011). But the "defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case," as "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *See Strickland*, 466 U.S. at 693-94.

Where defense counsel was deficient in failing to investigate and present mitigating evidence at sentencing, the defendant is required to "show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." *See Porter*, 558 U.S. at 41. "To assess that probability," the court must "consider 'the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding' — and 'reweigh it against the evidence in aggravation.'" *Id.* (alteration omitted) (quoting *Williams*, 529 U.S. at 397-98).

a.

Here, although Sergeant Coleman highlighted them in the state habeas proceedings, the State Decision failed even to recite either *Strickland*'s reasonable probability standard or the associated totality-of-the-evidence standard. Moreover, the State Decision's prejudice analysis in no way implies an appreciation of these standards. To the contrary, the State Decision explicitly and inarguably utilized a different and more strenuous standard — akin to the preponderance-of-the-evidence standard rejected by *Strickland* — under which the State Decision concluded there was no showing of prejudice because

82

Coleman's habeas corpus evidence "would not have" resulted in a different sentence. *See* State Decision 13-14 (variously specifying that such evidence "would not have produced a different result," "would not have produced a different outcome," and "would not have resulted in a different outcome").

Having characterized Coleman's petitions as asserting three distinct ineffective assistance claims premised on the failures to obtain a psychological evaluation, present medical records, and introduce more than a cursory view of Coleman, the State Decision analyzed each claim separately and announced three separate prejudice rulings. The respective analyses included factual findings with respect to select pieces of the habeas corpus evidence, with no discussion of large chunks of evidence that had been emphasized by Coleman. For example, although the State Decision referenced some of the evidence concerning Coleman's juvenile history, it did not address any of the July 2017 evidentiary hearing testimony regarding his military service and the marked changes in his behavior just prior to his March 2011 crimes. In examining the psychological evaluations conducted by Coleman's two expert witnesses, the State Decision failed to acknowledge Dr. JoEllen Salce Rogers's March 2015 interview-based evaluation; instead, the State Decision discussed only Dr. Rogers's earlier January 2015 affidavit and Dr. Victoria Reynolds's January 2016 declaration, which the State Decision criticized for, inter alia, merely involving records reviews.

Assessing how the judge "would have" ruled at sentencing based on the select pieces of the habeas corpus evidence, the State Decision concluded that the judge would have newly blamed Coleman's crimes on drug and alcohol abuse that justified at least the

83

sentence previously imposed. *See, e.g.*, State Decision 13 (pronouncing "that Coleman's history of substance abuse and his substance abuse at the times of his crimes would have exacerbated his liability"). Relevant to that conclusion, the State Decision explained that, after reviewing Dr. Rogers's January 2015 affidavit and Dr. Reynolds's January 2016 declaration, the judge would have found that Coleman's March 2011 offenses resulted from "drunken and drug-induced misbehavior not connected with [PTSD]." *Id.* at 6. The State Decision further specified that the judge would have found that "to the extent that [Coleman's medical records] show any PTSD, that condition is less significant than the finding of substance abuse." *Id.* at 8. And the State Decision determined that the judge would have interpreted the juvenile history evidence to establish that a young Coleman's substance abuse was "self-induced," caused his childhood mental health problems, and made him a violent juvenile delinquent and troublemaker while under the influence. *Id.* at 12-13. The State Decision noted that because of Coleman's presentation of juvenile history evidence, the judge inevitably would have considered Coleman's juvenile criminal record despite its expungement, and that the use of the juvenile criminal record to increase Coleman's sentencing guidelines range was inconsequential as he would have received an above-guidelines sentence anyway.

Simply put, the State Decision's prejudice analysis flouted *Strickland* and its binding progeny. Rather than applying the reasonable probability standard and considering whether "there is a reasonable probability [Coleman] would have received a different sentence," *see Porter*, 558 U.S. at 41, the State Decision assessed whether Coleman's sentence "would have been different" and thereby employed a standard similar to the

forbidden preponderance-of-the-evidence standard, *see Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (per curiam) (recounting that *Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered"). Consequently, the State Decision was plainly "contrary to" *Strickland* within the meaning of 28 U.S.C. § 2254(d)(1). *See Williams*, 529 U.S. at 413 (explaining that under § 2254(d)(1), a state decision is "contrary to" clearly established federal law if, inter alia, it "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law"); *cf. Rose v. Lee*, 252 F.3d 676, 689 (4th Cir. 2001) (concluding that the use of the preponderance-of-the-evidence standard "was 'contrary to' the *Strickland* test because the State court applied the wrong burden of proof with respect to the prejudice prong").

Furthermore, the State Decision disregarded the totality-of-the-evidence standard and failed to "consider 'the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding' — and 'reweigh it against the evidence in aggravation.'" *See Porter*, 558 U.S. at 41 (alteration omitted) (quoting *Williams*, 529 U.S. at 397-98). Instead, the State Decision "engaged in a different analysis — an analysis that unreasonably broke from *Strickland* by considering less than the totality of the evidence, and one that unreasonably discounted evidence favorable to [Coleman] by unduly minimizing its import and evaluating it piecemeal." *See Elmore v. Ozmint*, 661 F.3d 783, 868 (4th Cir. 2011). By "neither acknowledg[ing] nor obey[ing]" the totality-of-the-evidence standard, the State Decision's prejudice analysis was again

85

"fatally unreasonable." *Id.* (citing, inter alia, *Williams*, 529 U.S. at 397-98; *Porter*, 558 U.S. at 42).[11]

b.

In these circumstances, where the State Decision defied *Strickland* and applied an incorrect burden of proof, we are left to conduct a de novo analysis of the prejudice issue. *See Rose*, 252 F.3d at 689-90 (4th Cir. 2001) (explaining that, upon determining "that a state court decision is contrary to clearly established federal law," it is "the federal habeas corpus courts' obligation to review [the] state court judgment[] independently to determine whether issuance of a writ is warranted"). Properly applying the reasonable probability and totality-of-the-evidence standards, we conclude that Sergeant Coleman has demonstrated prejudice and thus proven his Sixth Amendment ineffective assistance of counsel claim and established his entitlement to 28 U.S.C. § 2254 relief.

(1)

To summarize the evidence that we must consider under the totality-of-the-evidence standard, the evidence before the judge at Sergeant Coleman's sentencing hearing of August 24, 2012, was that a highly intoxicated Coleman had abducted and shot victim Mary Cook-Moore in her parents' Roanoke County home during the early morning hours

---

[11] We observe that under 28 U.S.C. § 2254(d)(1), a state decision is also "contrary to" clearly established federal law if it "decide[d] [the] case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *See Williams*, 529 U.S. at 413. Although we recognize many factual similarities between this case and *Porter*, we do not rely on this aspect of the "contrary to" clause and have not analyzed or decided whether the facts of this case and *Porter* are materially indistinguishable.

86

of March 17, 2011, resulting in grievous injuries that upended Cook-Moore's and her family's lives. Coleman continued to drink throughout the day and returned to the scene of the shooting that evening, when he allegedly attempted to back into Cook-Moore's mother with his vehicle and then recklessly drove off. Finally, still intoxicated late that night, Coleman and an accomplice viciously attacked victim Tyler Durham in the men's restroom of a City of Roanoke bar, breaking Durham's ankle in three places.

Coleman's Presentence Investigation Report reflected that Coleman lied to the probation officer by disclaiming a juvenile criminal record, that Coleman was a bad child despite his report of a good childhood, and that he had made undocumented and thus questionable claims of decorated Army service, a combat-related traumatic brain injury, and ensuing PTSD. During the sentencing hearing, the prosecutors had the probation officer confirm that Coleman lied about his juvenile criminal record and that, despite opportunities for rehabilitation and mental health treatment, the juvenile criminal record reflected multiple contacts with the juvenile court system, including at least one felony conviction used by the probation officer to increase Coleman's sentencing guidelines range. The probation officer further testified that Coleman had falsely denied breaking Durham's ankle by twisting his leg and expressed concern for himself rather than his victims. Cook-Moore also gave damaging victim impact testimony.

Coleman's sentencing evidence consisted almost entirely of his own testimony, in which he accepted responsibility and apologized for his March 17, 2011 crimes and otherwise shared modest and limited details of his childhood, military service, traumatic brain injury sustained in Afghanistan on January 19, 2011, and subsequent struggles with

PTSD. The only other evidence proffered by Coleman's defense counsel was a so-called "document of injuries" from Coleman's commanding officer, which simply stated that Coleman had been released from his Army regiment on January 19, 2011, for continuation of medical care, without specifying any injury being treated. The lack of reference to a head injury in that document, and the lack of other military and medical records corroborating Coleman's testimony, were fodder for the prosecutors.

Moreover, at the outset of Coleman's testimony, his lawyer had Coleman confirm that he had a juvenile criminal record. On cross-examination, when the prosecutors attempted to use the juvenile criminal record to impeach Coleman and depict him as a liar, Coleman raised the issue of expungement, explaining that he told the probation officer he did not have a juvenile criminal record because he believed it had been expunged. Nevertheless, neither the prosecutors, judge, nor even Coleman's own lawyer said another word about expungement, and the sentencing hearing proceeded without anyone questioning whether it was proper to consider the juvenile criminal record.

Instead, in their closing arguments, the prosecutors urged the judge to look at the juvenile criminal record as proof that Coleman had always been a violent and compassionless person, belying any notion that he was only later "messed up" by his wartime military service. The prosecutors also painted Coleman's military service not as virtuous, but as an outlet for innate violence and cruelty.

In his own closing argument, Coleman's defense counsel emphasized that Coleman admitted on direct examination to having the juvenile criminal record. Meanwhile, the lawyer made no effort to promote Coleman's testimony about his January 2011 traumatic

88

brain injury or subsequent PTSD, or to draw a connection between those combat injuries and Coleman's March 2011 crimes. To the contrary, the lawyer expressly conceded that there was "no excuse" for Coleman's "horrible" offenses. The lawyer's mitigation presentation relied only on Coleman's bare testimony about his military service and remorse for his crimes.

The judge imposed the above-guidelines sentence, specifying that he did so because of the horrificness of Coleman's offenses, his lifelong and abnormal lack of compassion and caring for others, the apparent disingenuousness of his claims of remorse, and the lack of explanation for how his offenses could have occurred on the single-day timeline. The judge deemed that timeline to be the "most aggravating" aspect of Coleman's case.

Obviously, the judge's lack-of-compassion finding was premised on Coleman's juvenile criminal record. The remorselessness finding was explicitly based on Coleman's statements to the probation officer falsely denying that he twisted Durham's leg and expressing concern for himself rather than his victims. The judge did not indicate whether he otherwise found Coleman to lack credibility, including with regard to his testimony about his January 2011 traumatic brain injury or his subsequent PTSD. To the extent that the judge may have taken it upon himself to consider whether those combat injuries contributed to Coleman's March 2011 crimes, the judge rejected any such connection, having found that Coleman's offenses lacked explanation. The judge did expressly accept that Coleman's military service was commendable and apparently entirely lawful, but did not deem it significant enough to be worthy of any mitigating weight.

89

In the state habeas corpus proceedings, Coleman presented a wealth of new evidence aimed at countering what he termed the "false narrative" that had been advanced by the prosecutors, allowed by his defense counsel, and largely adopted by the judge at sentencing. That included a plethora of school, social services, military, and medical records, the psychological evaluations of two expert witnesses, and the July 12, 2017 evidentiary hearing testimony of five fact witnesses other than Coleman himself.

Challenging the depiction of Coleman as a liar, the habeas corpus evidence confirmed that he told the truth to the probation officer and to the sentencing judge when he claimed that he had no juvenile criminal record and that such record had been expunged. The evidence also called into question the probation officer's finding of a juvenile felony conviction and use of that purported conviction to increase Coleman's sentencing guidelines range, and it offered corroboration of Coleman's assertions about his January 2011 traumatic brain injury and subsequent PTSD.

Challenging the portrayal of Coleman as a forever violent and compassionless person, the evidence of his juvenile history included that he did not have a good childhood, but one devastated by his abusive biological father, who introduced a young Coleman to sex, drugs, and crime; that there were no allegations in his juvenile criminal record or school or social services records that Coleman was ever violent, except for persistent concerns that he might harm himself; that Coleman was actually known to be likeable, kind, compassionate, and nonviolent throughout his teenage years; and that Coleman embraced the services and treatments accorded him as a teenager, overcame setbacks, and successfully transitioned into being a responsible and self-sufficient adult. The evidence

90

of Coleman's subsequent military service was that he was never inappropriately violent or cruel, and that he instead acted with exceptional trustworthiness, loyalty, skill, courage, and leadership.

Lastly, challenging the depiction of Coleman as fully culpable and remorseless for his March 2011 crimes, the habeas corpus offered an explanation for the offenses and their single-day timeline. In particular, Colonel James Gaylord confirmed not only that Coleman had sustained the January 2011 traumatic brain injury in Afghanistan, but also that in the three months prior to that rocket attack, he had been injured by an IED and witnessed the violent and devastating death of his close friend. Military medical records indicated that the January 2011 rocket attack was Coleman's second traumatic brain injury exposure within those three months, and Gaylord testified to serious physical injuries that required Coleman to be evacuated from Afghanistan for proper treatment. Gaylord also discussed PTSD and other mental health problems for which Coleman neither requested nor received adequate care, as was common among soldiers at the time. Family members described the marked changes in Coleman's behavior upon his return to the United States from Afghanistan, including excessive drinking and apparent paranoia and memory problems. Witness after witness insisted that Coleman's criminal conduct of March 2011 was wholly inconsistent with the Coleman that they had previously known.

Records of Coleman's voluntary mental health hospitalization in the immediate aftermath of his March 2011 offenses reflected that he had exhibited suicidal ideation, substance withdrawal, remorse for his actions, and feelings of guilt and anxiety, and that he was discharged with diagnoses of not only alcohol and opioid dependence, but also

91

PTSD. Premised on an initial records review, expert witness Dr. JoEllen Salce Rogers opined in January 2015 that Coleman's combat-related traumatic brain injuries and PTSD led to his March 2011 crimes. Dr. Rogers then reiterated her military PTSD diagnosis in a March 2015 interview-based evaluation of Coleman, attributing Coleman's drug and alcohol abuse to self-medication of his otherwise untreated PTSD. In January 2016, after another records review, expert witness Dr. Victoria Reynolds concurred in Dr. Rogers's March 2015 diagnosis of military PTSD and further opined that Coleman may have suffered from childhood PTSD. Echoing Dr. Rogers, Dr. Reynolds explained that Coleman was susceptible to substance abuse to manage his PTSD symptoms. And Dr. Reynolds similarly emphasized that PTSD could not be "minimized or overlooked" as a factor in Coleman's March 2011 offenses.

(2)

We readily agree with Sergeant Coleman that, like *Porter*, "[t]his is not a case in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge.'" *See Porter*, 558 U.S. at 41 (quoting *Strickland*, 466 U.S. at 700). In addition to challenging the prosecutors' portrayal of Coleman as a liar, as a forever violent and compassionless person, and as fully culpable and remorseless for his crimes, the habeas corpus evidence is helpful to Coleman in other ways. It provides a far fuller picture of Coleman than that afforded by his own sentencing hearing testimony, which was both limited and easily dismissible as self-serving. The habeas corpus evidence suggests not only that Coleman was truthful in his sentencing hearing testimony, but also that he vastly

92

understated the difficulties he experienced as a child, the valorousness of his military service, and the horrors he confronted in combat.

Whereas the sentencing judge "heard almost nothing that would humanize [Coleman] or allow [the judge] to accurately gauge [Coleman's] moral culpability," the new evidence reveals "the 'kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability.'" *See Porter*, 558 U.S. at 41 (quoting *Wiggins*, 539 U.S. at 535); *see also Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (explaining that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse" (internal quotation marks omitted)). The habeas corpus evidence of Coleman's abusive childhood, heroic and trauma-inducing military service, combat-related traumatic brain injuries, untreated PTSD, and resort to self-medication with drugs and alcohol is just such relevant evidence.

For example, as *Porter* recognized, "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines." *See Porter*, 558 U.S. at 43-44 (emphasizing that "the relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter"). And although the State Decision pronounced "that the introduction of records showing drug use is always a double-edged sword," *see* State Decision 13 (citing *Lewis v. Warden*, 645 S.E.2d 492, 505-06 (Va.

93

2007)), the relevant state precedent is not so absolute and specifies that such evidence may be aggravating when the use began "voluntarily." *See Lewis*, 645 S.E.2d at 505-06 (explaining that drug use "evidence could be viewed both in aggravation and mitigation" where on the one hand, the evidence was that Lewis's "abuse of narcotics and other prescription drugs could have affected her judgment and have caused her to appear 'uncaring' at the time of the offenses," but on the other hand, "the evidence also showed that, initially, Lewis voluntarily consumed excessive prescription drugs"). Coleman's evidence is not that his substance use began voluntarily, but rather that he was introduced as a child to drugs and alcohol by his father, became addicted to those substances as a result of the childhood abuse he suffered, and later fell back into substance abuse as a result of his military PTSD.

To be sure, the habeas corpus evidence in no way lessens the horrificness of the March 2011 offenses or the single-day timeline that the sentencing judge deemed to be the most aggravating aspect of Coleman's case. But the new evidence does render dubious the judge's reliance on the notions that Coleman was then and had always been a violent and compassionless person, that his claims of remorse were disingenuous, and that there was no explanation for his crimes. Moreover, the new evidence provides a compelling basis for some measure of mercy that the judge previously saw insufficient reason to accord.

It therefore must be concluded under the totality-of-the-evidence and reasonable probability standards that the deficient performance of Coleman's defense counsel was prejudicial. That is, considering the totality of the mitigating evidence — consisting mostly of the new evidence — and reweighing it against the evidence in aggravation, there is

"clearly a reasonable probability" of a different sentence. *See Porter*, 558 U.S. at 42. We underscore that we do not rule today that, presented with the new evidence, the sentencing judge would not or could not have imposed the same sentence based on the aggravating factors (and lack of mitigating factors) found at Coleman's August 2012 sentencing, or on the substance abuse aggravator identified in the state habeas corpus proceedings. Rather, we recognize that the new evidence engenders the likelihood of a different result "sufficient to undermine confidence in" Coleman's existing sentence. *See Strickland*, 466 U.S. at 694.[12]

c.

Finally, we briefly respond to several arguments advanced by the Commonwealth on appeal. *First*, the Commonwealth characterizes this as a case implicating the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1), i.e., one in which "the state court identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but [allegedly] unreasonably applie[d] that principle to the facts of the prisoner's case." *See Williams*, 529 U.S. at 413. As such, the Commonwealth insists that the State Decision's prejudice analysis is entitled to substantial deference. *See, e.g.*, Br. of Appellee 31 (asserting that "the only question that matters on review is 'whether the [state court], notwithstanding its substantial latitude to reasonably determine that a defendant has not [shown prejudice], still managed to blunder so badly that every fairminded jurist would

---

[12] Considering our prejudice ruling, we need not consider whether the probation officer's unchallenged use of Sergeant Coleman's expunged juvenile criminal record to increase his sentencing guidelines range was also prejudicial.

95

disagree'" (alterations in original) (quoting *Mays v. Hines*, 592 U.S. 385, 392 (2021) (per curiam))).  As heretofore explained, however, this case implicates § 2254(d)(1)'s "contrary to" clause because — by flouting *Strickland*'s reasonable probability standard and the associated totality-of-the-evidence standard — the State Decision "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law."  *See Williams*, 529 U.S. at 413.  We have thereby been left to conduct a de novo prejudice analysis.  *See Rose*, 252 F.3d at 689-90.

*Second*, the Commonwealth suggests that because "[t]he judge who presided over the state habeas proceedings was the same judge who had presided over Coleman's sentencing hearing," the State Decision deserves some sort of heightened deference based on the judge being "'ideally situated' to assess the effect that the evidence presented at the evidentiary hearing would have had on the sentence."  *See* Br. of Appellee 33 (citing *Schriro v. Landrigan*, 550 U.S. 465, 476 (2007)).  The *Schriro* decision, however, simply observed "that the judge presiding on postconviction review was ideally situated to make [a factual] assessment [concerning Landrigan's colloquy with the sentencing court] because she is the same judge who sentenced Landrigan and discussed these issues with him."  *See Schriro*, 550 U.S. at 476.  *Schriro* did not deem the judge entitled to heightened deference with respect to a *Strickland* prejudice analysis.  And in any event, *Schriro* did

not excuse the judge from heeding the reasonable probability and totality-of-the-evidence standards.[13]

*Third*, the Commonwealth defends the State Decision's "fail[ure] to expressly address evidence Coleman presented at the evidentiary hearing" on the ground that "AEDPA does not require the state court to 'refer to each piece of a petitioner's evidence.'" *See* Br. of Appellee 38 (quoting *Crockett v. Clarke*, 35 F.4th 231, 244 (4th Cir. 2022)). Again, however, we fault the State Decision for applying an incorrect burden of proof, not for simply failing to discuss all of the habeas corpus evidence.

*Fourth*, with respect to Coleman's expunged juvenile criminal record, the Commonwealth asserts that — although Coleman has correctly cited *Lavinder v. Commonwealth*, 395 S.E.2d 211, 212 (Va. Ct. App. 1990), for the proposition "that a prosecutor may not impeach a defendant with evidence of prior juvenile adjudications

---

[13] Although the Commonwealth has not gone so far as to argue that the judge was entitled to essentially conduct the state habeas corpus proceedings as a resentencing hearing, we emphasize the practical importance of separating the two because of, inter alia, the differences in state appellate review. *Compare Zemene v. Clarke*, 768 S.E.2d 684 (Va. 2015) (reflecting that state habeas corpus appeals go directly to Supreme Court of Virginia and pertain to legality of detention), *with Du v. Commonwealth*, 790 S.E.2d 493 (Va. 2016) (reflecting that sentencing appeals go first to Court of Appeals of Virginia and may involve all sorts of other issues). We also take this opportunity to express our hope — given that the judge in the state habeas corpus proceedings decided and declared how he would resentence Coleman — that any future resentencing proceedings will be conducted by a new judge. *See United States v. Lentz*, 383 F.3d 191, 221 (4th Cir. 2004) ("We have recognized that, even in the absence of established bias, reassignment to a different judge on remand is appropriate in unusual circumstances where both for the judge's sake and the appearance of justice an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality." (internal quotation marks omitted)).

97

under Virginia law" — that precedent is inapposite here in that "the prosecutor attacked Coleman's veracity on the basis that he had been untruthful with the probation officer when he denied to her that he had a juvenile record, not that the prosecutor impeached Coleman based on the juvenile adjudications themselves." *See* Br. of Appellee 43 n.4. Additionally, the Commonwealth asserts that the judge very well may have accepted Coleman's claim of expungement during the sentencing hearing "and taken that into consideration in the initial sentencing." *Id.* at 44. The Commonwealth's assertions do not move us, because regardless of whether *Lavinder* is on point, the prosecution impeached Coleman without objection on a factually false premise, and because contrary to the theory of the judge's silent acceptance of Coleman's expungement claim, the judge unhesitatingly relied on the juvenile criminal record to aggravate Coleman's sentence.

*And fifth*, the Commonwealth suggests that much of the habeas corpus evidence was cumulative, in that the Presentence Investigation Report and Coleman's sentencing hearing testimony covered the same information about his juvenile history, military service, combat injuries, and subsequent struggles with his mental health and PTSD. The habeas corpus evidence, however, is far greater in scope and detail than the evidence before the judge at sentencing. *Compare supra* Part I.C.1-.2 (outlining the limited information in the Presentence Report and the sentencing evidence), *with supra* Part I.D.2 (surveying the wealth of habeas corpus evidence). Moreover, the habeas corpus evidence is of unquestionably superior quality, in that the sentencing evidence relied almost solely on Coleman's word. *See United States v. Ibisevic*, 675 F.3d 342, 351 (4th Cir. 2012) (recognizing that a defendant's testimony is easily "discounted by the jury when standing

98

alone," such that corroboration is critical to help "diminish the effect of [its] self-serving nature" (internal quotation marks omitted)).    Thus, neither this nor any of the Commonwealth's other arguments changes our conclusion that Coleman has demonstrated *Strickland* prejudice, proven his Sixth Amendment ineffective assistance of counsel claim, and established his entitlement to 28 U.S.C. § 2254 relief.[14]

IV.

Pursuant to the foregoing, we reverse the judgment of the district court and remand for the court's award of the writ of habeas corpus unless the Commonwealth of Virginia grants Sergeant Coleman plenary resentencing on his convictions in the Circuit Courts for the City and County of Roanoke within a reasonable time.  *See Gray v. Branker*, 529 F.3d 220, 242 (4th Cir. 2008); *see also Wolfe v. Clarke*, 718 F.3d 277, 285-88 (4th Cir. 2013) (recognizing district court's authority to ensure either that new state proceedings are conducted within reasonable time or that successful § 2254 petitioner is released).

*REVERSED AND REMANDED*

---

[14] We also briefly respond to our good dissenting colleague, who asserts that we err today by analyzing the prejudice issue de novo.  Suffice to say that even if the State Decision's prejudice analysis were entitled to deference, we would rule that it involved an unreasonable application of *Strickland* and its binding progeny.  Indeed, that Sergeant Coleman suffered prejudice is the only reasonable conclusion herein.

RUSHING, Circuit Judge, dissenting:

"Under AEDPA, state courts play the leading role in assessing challenges to state sentences based on federal law." *Shinn v. Kayer*, 141 S. Ct. 517, 526 (2020) (per curiam). Christopher Coleman challenged his Virginia criminal sentences in a Virginia habeas corpus proceeding, contending that his sentences were imposed in violation of his Sixth Amendment right to effective assistance of counsel. Applying federal law, the state court—in fact, the same judge who had sentenced Coleman almost six years earlier—found that Coleman's attorney's actions or omissions at sentencing had not prejudiced him. Coleman now presses the same claim in federal court. Under AEDPA's deferential standard, the question for a federal court is whether the state judge unreasonably concluded that his prior sentencing decision would not have been different had he heard all the habeas evidence at the sentencing hearing. In other words, did the state judge "manage[] to blunder so badly" in assessing the effect the new evidence would have had on his own sentencing decision in this case "that every fairminded jurist would disagree" with his assessment of the probability that he would have imposed a different sentence? *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021).

Coleman cannot make this showing. And the majority does not require it. Instead, the majority jettisons the restrictive AEDPA standard and "conduct[s] a de novo analysis of the prejudice issue." Maj. Op. 86. The majority bases its refusal to apply AEDPA deference on a supposed defect in the legal standard the state habeas court applied—a defect Coleman did not raise and no party has briefed. But the majority is wrong: the state habeas court did not apply an incorrect legal standard and we are not free to evaluate

100

Coleman's Sixth Amendment challenge de novo. The majority then multiplies its error by vacating not only Coleman's state sentence on the sole conviction before us in this appeal but also vacating his state sentences on other convictions Congress has forbidden us to review. *See* 28 U.S.C. § 2244(d).

Because the majority disregards AEDPA at every turn, I respectfully dissent.

## I.

Congress has prohibited federal courts from granting habeas relief to state prisoners on the basis of claims previously adjudicated on the merits in state court unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). A decision may be "contrary to" Supreme Court precedent either because "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or because "the state court confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at" the opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state-court decision is an "unreasonable application" of Supreme Court precedent if the state court "correctly identifies the governing legal rule" but "unreasonably applies the law . . . to the facts of a prisoner's case." *Id.* at 407, 409. "[A] state court's factual findings must be presumed correct, absent rebuttal by the petitioner by clear and convincing evidence." *Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 524 (4th Cir. 2016); *see* 28 U.S.C. § 2254(e)(1).

101

Under this deferential standard, a state-court decision "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (per curiam) (internal quotation marks omitted). In other words, to merit relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Coleman has alleged ineffective assistance of counsel during his state-court sentencing. A successful ineffective-assistance claim requires showing that (1) counsel performed deficiently and (2) a "reasonable probability" exists "that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). A "reasonable probability" requires "a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Richter*, 562 U.S. at 112).

Faithfully applying AEDPA's deferential framework to a state court's habeas decision on an ineffective-assistance claim is of "special importance." *Kayer*, 141 S. Ct. at 523. "Ineffective-assistance claims can function as a way to escape rules of waiver and forfeiture, and they can drag federal courts into resolving questions of state law." *Id.* (internal citation omitted). Moreover, the Supreme Court has "recognized that 'the more general the rule, the more leeway state courts have.'" *Id.* (quoting *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2560–2561 (2018) (per curiam)). "'[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a

102

defendant has not satisfied that standard.'" *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).   Put simply, in a case like this one, where the state habeas court determined that counsel's supposed errors did not prejudice Coleman in his state sentencing, "deference to the state court" is "near its apex." *Sexton*, 138 S. Ct. at 2560.

## II.

Instead of examining the state court's disposition of Coleman's ineffective assistance of counsel claim through AEDPA's deferential lens, the majority reviews his claim de novo.   Regarding the prejudice prong—the only element upon which the state court ruled—the majority allows itself de novo review by first finding that the state court imposed a burden of proof more strenuous than *Strickland* requires.   Specifically, the majority faults the state court for concluding that Coleman's habeas evidence "would not have" resulted in a different sentence, as opposed to concluding that there wasn't "a reasonable probability" his evidence would have resulted in a different sentence, and supposedly failing to consider the totality of the evidence.   Maj. Op. 83, 84 (internal quotation marks omitted).   That criticism is misplaced.

First, none of the parties read the state court's opinion as applying an incorrect legal standard.   Coleman did not raise this issue on appeal or in his federal habeas petition.   Nor did Coleman present any other basis for this Court to review his ineffective assistance of counsel claims de novo.   Instead, Coleman himself understands the state court to have "determined that there was no reasonable probability [the court] would have sentenced Coleman to a lesser term of years."   Opening Br. 16.   The majority thus errs in reversing on this forfeited argument, to which the State has had no opportunity to respond.   *See*

*United States v. Walton*, 145 F.4th 476, 489 (4th Cir. 2025) ("[C]ontentions not raised in the argument section of the opening brief are abandoned." (internal quotation marks omitted)); *Hyman v. Hoekstra*, 41 F.4th 272, 290 (4th Cir. 2022) ("[W]e may 'review[] only the claims presented in the § 2254 petition,' not those of our own creation." (quoting *Folkes v. Nelsen*, 34 F.4th 258, 267 (4th Cir. 2022))); *United States v. Oliver*, 878 F.3d 120, 127 (4th Cir. 2017) ("When the court raises a forfeited issue sua sponte, it undermines the principle of party presentation and risks becoming a third advocate.").

Second, the state habeas court did not apply an incorrect standard. After considering all the evidence, the state habeas court concluded, with regard to the issues presented here, that introduction of records about Coleman's combat-related injuries and additional evidence about his childhood "would not have produced a different outcome at sentencing." J.A. 954–955. Instead, "Coleman's history of substance abuse and his substance abuse at the times of his crimes" as revealed in those records "would have exacerbated his liability." J.A. 954.

The state court did not set a higher standard than *Strickland* requires and find that Coleman failed to meet it. Specifically, the state court did *not* conclude that Coleman had *failed to prove* that his sentence would have been different, which would imply a preponderance of the evidence standard. *See, e.g.*, *Rose v. Lee*, 252 F.3d 676, 689 (4th Cir. 2001); *cf. Williams*, 529 U.S. at 405–406. Instead, the state court concluded that Coleman's sentence *in fact would not have been different*. In other words, the new evidence definitely would not have changed the sentence. There was not a "reasonable probability" of a

104

different outcome because there was no probability of a different outcome. *Strickland*, 466 U.S. at 694.

The judge presiding over Coleman's state habeas proceeding "was ideally situated" to make that assessment of the evidence because he was the same judge who sentenced Coleman originally. *Schriro v. Landrigan*, 550 U.S. 465, 476 (2007). In other words, the judge who sentenced Coleman reviewed all the habeas evidence that Coleman argued should have been introduced in his sentencing proceeding and concluded that it "would not have produced a different outcome at sentencing." J.A. 954. Nothing about that conclusion suggests that the state court applied a legally erroneous burden of proof.

The same goes for the "totality of the evidence" standard. In its order denying relief, the state court evaluated the evidence adduced in the habeas proceeding, compared it to the evidence produced at the sentencing hearing, and analyzed how the new evidence interacted with the old evidence and the likely effect it would have had on Coleman's sentencing profile. *See generally* J.A. 942–955. The majority faults the state court for not mentioning every shred of evidence from the habeas proceeding in its decision and for supposedly "announc[ing] . . . separate prejudice rulings" on Coleman's claims. Maj. Op. 83. The state court's opinion, however, provides no reason to think the court failed to consider all the evidence before it, and after discussing each category of evidence on which Coleman relied, the court then issued a combined set of rulings concluding that Coleman

105

had "not shown that his attorney's actions or omissions prejudiced [him]" "under the criteria set forth in *Strickland v. Washington*." J.A. 955.

Moreover, the majority fundamentally misunderstands the limited nature of our review of state court decisions under AEDPA. The question here is whether the state adjudication "resulted in a decision" that was contrary to or objectively unreasonable under clearly established federal law. 28 U.S.C. § 2254(d)(1). That deferential standard applies even when the state court provides no reasoning for its decision at all. *Richter*, 562 U.S. at 98. We have no license to override a state court's habeas ruling because the court did not mention in its written opinion certain evidence we find persuasive. *See id.*; *see also Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) (warning that a federal court may not "substitute[] its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)").

Because the state habeas court did not apply an incorrect burden of proof, and because Coleman forfeited any argument to the contrary, the majority errs by reviewing his ineffective assistance of counsel claims de novo.

III.

Turning to the merits of Coleman's appeal, "[i]t is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme] Court[] precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508–509 (2013) (quoting *Richter*, 562 U.S. at 102). The state court here focused on *Strickland*'s second prong, concluding that Coleman was not prejudiced by sentencing counsel's alleged errors.

106

As to both issues on which we granted Coleman a certificate of appealability, the record amply supports the conclusion that the state court did not act unreasonably in denying Coleman relief.

## A.

The first issue for our review is whether Coleman's sentencing counsel "rendered ineffective assistance by failing to sufficiently investigate, seek, obtain, and produce evidence to present on Coleman's behalf at sentencing, or by failing to seek a continuance to adequately prepare" for sentencing. Order, *Coleman v. Clarke*, No. 20-7083 (4th Cir. Feb. 17, 2022), ECF No. 9. According to Coleman, the sentencing court decided his sentence by accepting the prosecutors' narrative that Coleman was a violent, compassionless liar. He argues that counsel's failure to produce mitigating evidence to combat that narrative severely disadvantaged him. Coleman contends that evidence concerning his turbulent childhood, substance abuse, and mental health disorders would have contextualized his juvenile criminal record, and certain medical records would have corroborated his testimony at sentencing about his combat-related head injuries and post-traumatic stress disorder (PTSD). Not having this evidence, the argument goes, not only left the prosecutors' narrative unchallenged but allowed them to make Coleman look like a liar when he testified about these subjects.

After conducting an evidentiary hearing, the state habeas court rejected these arguments. Regarding the argument that sentencing counsel should have introduced documents concerning Coleman's "juvenile placements, treatment and mental illnesses and his father's mental health and criminality," the court found that the presentence report

107

(PSR) "discuss[ed] the placements, the father's circumstances and Coleman's mental health history, including numerous hospitalizations" and "set forth Coleman's statement that he had had a good childhood." J.A. 950. The court noted that Coleman's new exhibits "inextricably address[ed] his contacts with the juvenile justice system and . . . could not have been presented without revealing" Coleman's juvenile criminal record. J.A. 950. The court rejected Coleman's argument that "the records [were] overwhelmingly helpful to [him]" because that argument "ignore[d] the consistent findings of substance-abuse arising again and again in that history." J.A. 951. In fact, Coleman's new exhibits showed "substantial and persistent drug use" and problems with anger management. J.A. 951–953. And the court found that the evidence contained little support for Coleman's claim that his father had abused him.

As for Coleman's argument that "records from Kandahar Hospital and Lewis-Gale Hospital would have shown the circumstances of his injury in combat, a second traumatic brain injury, amnesia, and post-traumatic stress disorder," the court found that these records also were not helpful to Coleman. J.A. 948–949. While the court did not entirely reject the notion that these records might show a brain injury and PTSD, it concluded that the records did not show the sort of severe condition that would have mitigated the seriousness of Coleman's crimes. The court found that the military medical records on which Coleman relied showed "a normal neurological examination," with a normal level of consciousness, normal cognitive functioning, no decrease in ability to concentrate, and normal speech and motor function. J.A. 948–949. The court concluded that the report "would not have shown a brain injury, if any, sufficient to mitigate the outrageous nature of the offenses and

Coleman's history." J.A. 949. As for the Lewis-Gale records, which concerned Coleman's hospitalization shortly after he committed his crimes, the court found that what they revealed about Coleman's substance abuse was more significant than "the extent [to which] they show any PTSD." J.A. 949. The court quoted lines in those records that indicated Coleman "'has now escalated opioid use, abusing more readily and also, alcohol as well'" and that Coleman "'was treated by the Army for substance abuse'" in 2010. J.A. 949. "Overall, the records discuss substance abuse more than anything else, including a diagnosis of 'Opiate dependence, Alcohol abuse, episodic.'" J.A. 949.

The court concluded that "Coleman's history of substance abuse and his substance abuse at the times of his crimes would have exacerbated his liability." J.A. 949, 954. In short, the evidence Coleman wished his sentencing counsel had introduced on his behalf "would not have resulted in a different outcome at sentencing." J.A. 955. These findings and conclusions enjoy substantial support in the record.

### 1.

To begin, the record before the sentencing court sets the stage for demonstrating why the state habeas court's ruling was not unreasonable. The PSR and Coleman's testimony at the sentencing hearing presented contrasting depictions of Coleman, and this was largely his own doing. In his interview with probation officer Marcia Simmons, who prepared his PSR, Coleman put his own credibility at issue by deemphasizing, lying about, or avoiding discussion of his troubled past (including his mental health disorders and substance abuse), the extent of the injuries he suffered in the Army, and his substance abuse

109

at the time of his crimes.   He then took the stand and tried to correct the record at sentencing.

Examples abound.  Coleman reported to Simmons that "he had a good childhood." J.A. 533.  He said his parents divorced when he was a toddler and that "he knew nothing about his father." J.A. 533.  He "did not relate any of the difficulties he had as a teenager that led him to being hospitalized, placed in detention, or placed in group homes or other facilities." J.A. 533.  And although Coleman admitted he had tried cocaine in high school, he "gave no indication that drugs had been an issue for him in the past or that he had been in substance abuse treatment when he was a teenager." J.A. 537.  Besides telling Simmons he had been voluntarily hospitalized after committing his crimes, "Coleman did not report any further mental health history." J.A. 536.  Coleman asserted he had graduated from high school.

But Simmons reported in the PSR that Coleman's father was incarcerated, had a history of burglary and sex crimes, was a registered sex offender, and had "a mental health and substance abuse history." J.A. 533. She described in considerable detail how Coleman had several hospitalizations for mental health and substance abuse troubles, placements "in group homes [and] other facilities," and a juvenile criminal record. J.A. 530–531, 533, 536. At one group home, Coleman was discharged because his poor behavior—including threatening to kill staff and burn down the property—exceeded the scope of treatment that facility could offer.  Simmons indicated Coleman was diagnosed in his adolescence with "Opiate dependency, polysubstance abuse, recurrent depression," and "[c]onduct [d]isorder" and described a hospitalization for "using opiates, cocaine, and abusing

110

Adderall." J.A. 536. Simmons also discovered that Coleman obtained his GED without finishing high school.

At sentencing, Coleman changed course and acknowledged he did not have "a normal childhood," that his "father wasn't around," and that he started to "act[] out" in his teenage years because he disliked being around his mother and her boyfriends. J.A. 264. Coleman said he engaged in "bizarre behavior," attempted suicide, and was hospitalized for mental health reasons. J.A. 265. Coleman also acknowledged on cross-examination that he had "problems with violent behavior" in his youth. J.A. 290. He admitted he did not graduate from high school.

In his interview with Simmons, Coleman "described his health as good," recounted being injured in combat, and stated "he ha[d] no medical difficulties as a result of these injuries." J.A. 536. Yet at sentencing, Coleman testified at length about his military service, the commendations he received, the injuries he suffered while deployed, and the death of his best friend in the Army. He described the psychological impact that his injuries and losing a friend and fellow soldier had on him and testified he did not receive treatment for PTSD. He relied on all of this as mitigating evidence.

Additionally, Coleman asserted to Simmons that "he ha[d] no concerns regarding his use of alcohol, and he claimed it 'was not a contributor in the bar fight.'" J.A. 537. But then at sentencing, Coleman testified he should have checked himself into a hospital after the shooting instead of going to drink at the bar where he and an associate then senselessly mauled an innocent patron.

111

These discrepancies and contradictions put Coleman's credibility at issue, and his direct testimony about these issues opened the door for the prosecutors on cross-examination. Coleman's testimony in that portion of the hearing further impugned his credibility. He admitted hiding parts of his past from Army recruiters—particularly his psychiatric hospitalizations and problems with violent behavior. He admitted he did not tell "the whole truth" to his commanding officer about his mental state when he obtained leave to travel to Roanoke, where he committed his crimes. J.A. 291–292. And he appeared to agree that he did not receive a PTSD diagnosis by doctors at Fort Bragg upon returning to the United States. To be sure, the prosecutors presented testimony from Simmons that she believed Coleman had been untruthful with her about his juvenile record, and the prosecutors attempted to impeach Coleman because of his lack of candor on that score.[1] But as discussed herein, the mitigating evidence on which Coleman now relies contains numerous references to Coleman's interactions with the juvenile criminal justice system, and introduction of that evidence would have put that information before the sentencing court for consideration.

So the sentencing court had information regarding Coleman's family history, substance abuse, mental health struggles, military service, and combat-related injuries. Moreover, Coleman's obfuscation about these issues to Simmons and his contradictory testimony put his credibility on the line. Sentencing counsel's failure to present additional

---

[1] Whether Coleman's juvenile criminal record should have been considered is the focus of the second question presented on appeal.

112

mitigating evidence did not cause Coleman's credibility troubles at sentencing; Coleman himself accomplished that. And as described below, the evidence Coleman wishes sentencing counsel had introduced would not have fully rehabilitated his credibility but would have underscored just how much of his past Coleman had omitted.

2.

Next, consider the prosecutors' arguments at sentencing and the reasons the court gave for Coleman's sentence. In their arguments, the prosecutors did not ask the court to disbelieve Coleman's testimony, including about his combat-related injuries. Rather than disprove or discredit that testimony, they sought to foreclose Coleman from relying on an "inference" that his crimes were the result of his being "messed up by being in combat" and "by the things that [he] saw in Afghanistan." J.A. 308–309. According to the prosecutors, Coleman's crimes were better explained by violent tendencies he had since his youth. The military merely gave him "a sanctioned outlet" to exercise proclivities he already had. J.A. 312. They emphasized that Coleman's crimes, especially his attack on an unsuspecting bar patron, were "senseless and unprovoked violence and aggression." J.A. 313. And beyond not explaining the crimes, the prosecutors argued it would be inappropriate to "balance [Coleman's] military career against [his] crime[s]." J.A. 317. Moreover, although Coleman testified that he accepted responsibility for his actions, the prosecutors argued that Coleman lacked remorse because he told Simmons that "things are destroyed here for [him]," indicating self-focus and "no insight about the havoc he ha[d] wreaked" on his victims. J.A. 317. The prosecutors asked the court to disregard Virginia's sentencing guidelines, to vary upward, and to award restitution.

113

The sentencing court largely accepted the prosecutors' arguments. Except for Coleman's statements of remorse, which the court discredited, the court did not discount Coleman's testimony, including his account of his military service and combat-related injuries. Rather, the court said Coleman's military service was "commendable" and "appreciated." J.A. 320. Even so, the court saw Coleman's crimes as a continuation of patterns in his youth that had resurfaced after he returned from deployment. That is, although Coleman's military service might have been a temporary break in the pattern, it was not a permanent course correction.

In deciding Coleman's sentence, the court emphasized several factors. The "most aggravating" factor, in the court's view, was the seriousness of the offense and particularly that Coleman went to the bar, continued drinking, and then violently attacked Durham *after* having shot Cook-Moore, having been interviewed by the police, and having had an opportunity to cool off and collect himself. J.A. 322. The court also considered the need to protect society from crime, an important consideration here because the court believed Coleman's history showed he had lacked "compassion and caring for others . . . long before [he was] in the military." J.A. 319. Next, the court weighed the need for just punishment. It acknowledged that punishing Coleman could not cure the physical and emotional damage inflicted on his victims, their families, and society but also recognized "there [was] very clearly a need for punishment." J.A. 320. Furthermore, the court emphasized the need to promote respect for the law. Although Coleman's "commendable" and "appreciated" military service showed some respect for the law, his crimes were "as far from upholding respect for law as can be had." J.A. 320–321. The court reasoned it could

114

not expect citizens "to have any respect for the law if the sentence in this case was not of a fairly serious magnitude." J.A. 321. The court also discussed Coleman's remorsefulness, finding that his courtroom apology for his crimes was not credible. And finally, the court identified Coleman's youth as a mitigating factor. It concluded, however, that the seriousness of the offense outweighed the mitigating effect of Coleman's youth.

To summarize, the sentencing court largely accepted Coleman's testimony, including about his military service and related injuries. The testimony just didn't carry much weight in the sentencing analysis. Instead, the court focused on the seriousness of the offense, the need to promote respect for the law, the need to punish Coleman, and the need to protect society from further crime, for which the court found relevant the connection between Coleman's tumultuous youth and his crimes.

3.

With all that in mind, consider now the evidence Coleman says his counsel should have presented at sentencing had counsel rendered effective assistance. That evidence supports the sentencing court's conclusions and, taken together with the record that was before the sentencing court, demonstrates that the state habeas court was not unreasonable in concluding that failure to introduce this evidence did not prejudice Coleman.

To start, Coleman argues that sentencing counsel should have introduced numerous juvenile medical, school, and social services records. These records tell a tragic story about Coleman's adolescence. Regarding family history, the records contain a few reports that his father may have physically and sexually abused him and may have introduced him to drugs. Additionally, the records are replete with discussions about Coleman suffering

115

suicidal ideation and describe at least one instance where Coleman tried to overdose. They describe numerous mental health struggles with varying diagnoses from different providers but include repeated findings of disorders stemming from substance abuse. And the records indeed recount an extensive history of substance abuse, including that Coleman began abusing substances as early as age eleven and that he abused alcohol, cocaine, marijuana, mushrooms, LSD, Adderall, and opiates (including heroin). Although his behavioral records are somewhat mixed, one social worker assessed that Coleman "need[ed] to learn how to express anger through socially appropriate and acceptable means." J.A. 391. Moreover, references to Coleman's juvenile criminal charges are interspersed throughout, including references to petty larcenies, breaking and entering, destroying property, grand larceny, and at least one violation of a court order. Finally, several records indicate that Coleman made real improvement toward rehabilitation in late adolescence, which led a state court to expunge Coleman's criminal record so that he could join the Army.

Next, Coleman argues that sentencing counsel should have introduced military medical records concerning his combat-related injuries. Those records are not all that favorable to Coleman. On the one hand, the records confirm that Coleman was seen for a possible traumatic brain injury following a rocket attack. They also confirm that Coleman had previously suffered another traumatic brain injury from an improvised explosive device. On the other hand, the records do not show that Coleman suffered lingering physical effects from these injuries. A CT scan revealed "[n]o abnormal foci of altered attenuation . . . in the brain," "[n]o skull fractures," and "[n]o acute intracranial process."

116

J.A. 487, 494–495, 801, 808–809. Although medical personnel concluded Coleman "[m]ay have some stress reaction to the [rocket attack injury]," he had a normal level of consciousness, no observable decrease in his ability to concentrate, and normal cognitive functioning. J.A. 487, 801. And notably, the medical records list Coleman's problems to include a "panic disorder" and "benzodiazepine abuse." J.A. 488, 802.

Additionally, Coleman believes he was prejudiced by sentencing counsel's failure to introduce medical records from his hospitalization shortly after he committed his crimes because these records confirm he had a traumatic brain injury and PTSD. But the records are not so conclusive. Although the discharge summary suggests Coleman was diagnosed with PTSD, the remainder of the records say Coleman "reported having some possible PTSD type symptoms," was admitted for "questionable PTSD" and traumatic brain injury, and was given only a "provisional" PTSD diagnosis. J.A. 503, 514, 517. These records also show that while hospitalized, he tested positive for opiates, benzodiazepines, and alcohol. Coleman had "opiate dependence, questionable benzodiazepine dependence and alcohol dependence." J.A. 516. The discharge summary recounts that Coleman had "escalated opioid use, abusing more readily and also, alcohol as well." J.A. 503. These medical records also indicate that Coleman had previously received treatment in an Army substance abuse program. Coleman admitted to medical personnel that he had "rage/anger" and had suicidal ideations such as "shooting himself" or purposefully wrecking a friend's car by pulling the steering wheel while his friend was driving. J.A. 506.

In short, Coleman's juvenile records, military medical records, and medical records immediately post-dating his crimes all point in the same direction: that Coleman struggled

with anger, substance abuse, and troubled mental health. One of Coleman's own experts for the state habeas proceedings made the same observation, opining that "Coleman's polysubstance abuse began early in his adolescence and was notably severe and persistent throughout his adolescence, young adulthood and indeed throughout his military career." J.A. 840. The same issues recur repeatedly in Coleman's youth, his military career, and the circumstances surrounding his crimes.

Thus, after considering the record, there is no clear and convincing error in the state habeas court's factual findings that Coleman's evidence "inextricably addresse[s] his contacts with the juvenile justice system," J.A. 950, contains "consistent findings of substance-abuse" and "substantial and persistent drug use," J.A. 951, and shows violent tendencies and anger management problems. Or that Coleman's military medical records show "a normal neurological examination" with normal levels of consciousness, cognitive functioning, and ability to concentrate, as well as normal speech and motor function, following his second traumatic brain injury. J.A. 948–949. Or that the medical records from Coleman's hospitalization shortly after he committed his crimes "discussed substance abuse in detail," included a positive drug screen for "opioids and benzodiazepines," declared that Coleman had "escalated opioid use" and was "abusing . . . alcohol," and noted that he was "treated by the Army [in a] substance abuse program." J.A. 949 (internal quotation marks omitted).

And from these factual findings, the state habeas court's conclusions are not unreasonable. Recall that the sentencing court had information about Coleman's juvenile history, his military service and related injuries, and his inebriation from alcohol and

118

prescription pain medications at the time he committed his crimes. Recall also that in imposing Coleman's sentence, the court viewed the connection between Coleman's youth and his crimes as part of the need to protect the public from further crimes by Coleman. It was not unreasonable, therefore, for the state habeas court—the same judge who sentenced Coleman—to conclude that extensive additional information about Coleman's past substance abuse and troubled adolescence would have "exacerbated his liability." J.A. 949. It was not unreasonable to conclude that additional information detailing Coleman's substance abuse in his youth, in the military, and while he committed his crimes would have outweighed the mitigating effects of having more information about Coleman's brain injuries and PTSD. And it was not unreasonable to conclude that Coleman's "juvenile records, as a whole," would not have "provide[d] mitigation for his crimes." J.A. 954. Thus, the state habeas court did not unreasonably conclude that had sentencing counsel presented all this new evidence, it "would not have resulted in a different outcome at sentencing." J.A. 955.

4.

Coleman raises several counterarguments. First, he argues that presenting a fuller picture of his youth would have contextualized his troubled past and thus been a mitigating force at sentencing. But it is not unreasonable to think otherwise. As the state court noted, one of Coleman's experts opined that Coleman's "'polysubstance abuse began early in his adolescence'" and continued "'throughout his military career.'" J.A. 951 (quoting J.A. 840). Indeed, on the record before us, had a fuller picture of Coleman's youth been presented to the sentencing court, it would have confirmed the prosecutors' arguments and

119

the sentencing court's conclusion that Coleman's crimes were a continuation of past patterns of misbehavior, not new misconduct stemming from injuries and PTSD suffered as a result of serving in the Army.

Second, Coleman argues that the state court unreasonably discounted the favorable testimony at his habeas evidentiary hearing. According to Coleman, this testimony showed that he was kind and compassionate, in contrast to the sentencing court's conclusions that Coleman lacked compassion and the ability to care for others. The state habeas court briefly distinguished this testimony, concluding it only showed that "Coleman was likeable and non-violent" when he was sober. J.A. 953–954. That conclusion was not unreasonable. For example, a surveillance officer who worked with Coleman as a teenager and expressed a favorable opinion of him said she knew only that Coleman sometimes used marijuana and alcohol. But Coleman's new documentary evidence shows a much more severe substance abuse problem, demonstrating the limits of the surveillance officer's knowledge. Or to take another example, two witnesses testified about knowing Coleman while he was in the Army, and one testified Coleman drank little. But by all accounts, Coleman's military service was a positive time for him and apparently a period of relative sobriety, although his medical records suggest some abuse of substances other than alcohol. *See* J.A. 268 (Coleman testifying at sentencing that his deployment to Iraq was "[d]efinitely positive" and gave him "a purpose in life"). And in any event, although these witnesses testified to Coleman's good qualities, the state court did not unreasonably observe that their testimony was counteracted by Coleman's own testimony at sentencing that he had

120

"problems with violent behavior," J.A. 290, and the new documentary evidence that appears to confirm that self-assessment.

Finally, Coleman argues that his case is like *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam). In *Porter*, a jury had recommended that Porter be sentenced to death, and "[t]he sum total of the mitigating evidence [at sentencing] was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son." *Id.* at 32. The Supreme Court concluded that an effective lawyer would have presented evidence of "(1) Porter's heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." *Id.* at 41. The state court acted unreasonably by concluding that failure to present this evidence was not prejudicial. *Id.* at 42. The Supreme Court contrasted Porter's case with a scenario where the new mitigating evidence "would barely have altered the sentencing profile presented to the sentencing judge." *Id.* at 41 (internal quotation marks omitted).

This case is not sufficiently like *Porter* to make the different outcome here unreasonable. As discussed, the PSR included information about Coleman's juvenile criminal record, family history, substance abuse, mental health difficulties, social services placements, military service, and combat-related injuries, despite Coleman's attempts to thwart Simmons's ability to present a complete picture of him. At sentencing, Coleman elaborated on his military service, his injuries, and the commendations he received. And while Coleman's new evidence would have provided the sentencing court with more

121

granular detail and corroborated Coleman's testimony, it also would have exacerbated his sentencing exposure.  Thus, this is more like a case where the new evidence does not significantly alter the defendant's sentencing profile than it is like the facts in *Porter*.

Additionally, unlike Porter, Coleman was sentenced by a single judge to a term of years.  By contrast, Porter was sentenced to death only after a jury heard the evidence and recommended the death penalty and a judge found statutory aggravating factors without any mitigating circumstances.  *See Porter*, 558 U.S. at 32–33.  In that context, the question for *Strickland*'s prejudice prong was whether the additional evidence created a reasonable probability that the jury would not recommend death, or that the sentencing judge would balance the aggravating and mitigating factors differently, or that the sentencing judge would otherwise conclude that a death sentence was not warranted.  *See id.* at 41–42.  That multistage evaluation differs significantly from the underlying prejudice assessment here, which was whether the additional evidence created a reasonable probability that the sentencing judge would have sentenced Coleman to fewer years in prison.  *Porter* thus does not dictate a similar result here.

### 5.

In sum, on the first issue for which we granted a certificate of appealability, I would hold that the state habeas court's decision was not contrary to, or an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts.

122

B.

The second issue on which we granted Coleman a certificate of appealability is whether counsel "rendered ineffective assistance by failing to object to the probation officer's inclusion of Coleman's expunged juvenile criminal record in the presentence report and the Commonwealth's use of Coleman's juvenile adjudications to impeach [him]." Order, *Coleman v. Clarke*, No. 20-7083 (4th Cir. Feb. 17, 2022), ECF No. 9. As with the first issue, the state habeas court concluded that, even if counsel performed deficiently, Coleman was not prejudiced. That conclusion was not unreasonable.

To start, Coleman's new evidence is interspersed with references to and information about his juvenile adjudications or, at a minimum, the charges he faced. As the state court reasonably concluded, Coleman could not have introduced his juvenile medical, school, and social services records without also revealing his juvenile delinquency and his placements in group homes and other facilities. Thus, Coleman tries to have it both ways, arguing that he was prejudiced because counsel failed to object to the inclusion of his expunged juvenile record in the PSR and because counsel failed to introduce mitigating evidence that included similar information.[2]

Further, assuming Simmons's use of Coleman's expunged juvenile record to increase his Virginia sentencing guidelines range was error, Coleman has not shown any

---

[2] Although the juvenile records were expunged, Coleman does not claim that the offenses did not occur. And a defendant's prior criminal conduct, whether adjudicated or unadjudicated, including juvenile history, is admissible evidence at a sentencing hearing. *See Harris v. Commonwealth*, 497 S.E.2d 165, 171 (Va. Ct. App. 1998).

123

prejudice. "[T]he Virginia discretionary sentencing guidelines provide only flexible guideposts for the trial judge to consider in determining the appropriate sentence within the range of punishment defined by the legislature. . . . [T]he judge is not bound by a presumptive range and need not justify the decision by any standard." *Luttrell v. Commonwealth*, 592 S.E.2d 752, 755 (Va. Ct. App. 2004); *see*, *e.g.*, *West v. Dir., Dep't of Corr.*, 639 S.E.2d 190, 196 (Va. 2007) (noting defendant could not show prejudice under *Strickland* from increased guidelines range because guidelines "are discretionary, rather than mandatory"). At sentencing, the court expressly disregarded the guidelines and thereby disregarded Coleman's incorrect guidelines range. *See* J.A. 322–323 (finding Coleman's offenses "beyond the pale of the guidelines" and concluding "this case cannot be judged under the guidelines"). The court instead sentenced Coleman based on its own weighing of the seriousness of the offenses, the need to promote respect for the law, the need to protect society, and the need to provide just punishment. Accordingly, the state habeas court did not unreasonably reject Coleman's argument when the court reemphasized the belief it stated at sentencing that "'[t]he guidelines couldn't possibly encompass the facts that are present'" in Coleman's case. J.A. 954 (quoting J.A. 323).

Finally, Coleman was not prejudiced by sentencing counsel's failure to object when the prosecutors cross-examined Coleman about his lack of candor to Simmons regarding his juvenile record. Under Virginia law, a prosecutor may not use juvenile adjudications to impeach a defendant. *See Lavinder v. Commonwealth*, 395 S.E.2d 211, 212 (Va. Ct. App. 1990); *see also Middlebrooks v. Commonwealth*, 2002 WL 1751370, at *1–2 (Va. Ct. App. 2002). But here, the prosecutors did not use the juvenile adjudications themselves

124

to impeach Coleman. Instead, they impugned Coleman's credibility by asking whether he concealed his juvenile record from Simmons, a topic he had already discussed on direct examination. Moreover, during cross-examination, Coleman was able to inform the court that he believed the juvenile convictions had been expunged and thereby alert the court that considering those convictions might be improper, a possibility the sentencing court did not question. To the extent the sentencing court considered Coleman's past, it did so holistically to reject the notion that Coleman's combat-related injuries could explain away his crimes.

Therefore, as with the first issue on which we granted Coleman an appeal, I would hold on this issue too that the state habeas court's decision was not contrary to, or an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts.

## IV.

Having erroneously concluded that Coleman is entitled to federal habeas relief from his sentence for the single conviction that is before us on appeal, the majority compounds its error by also vacating his sentences for convictions that are not before us and which Congress has forbidden us to review. In doing so, the majority acts without authority.

As the majority explains, in the Circuit Court of the City of Roanoke, Coleman pleaded guilty to malicious wounding for his attack on Durham at the bar. Coleman also pleaded guilty—in the Roanoke County Circuit Court—to abduction, malicious wounding, and reckless driving in relation to menacing and shooting Cook-Moore at her home. The sentencing court conducted a joint sentencing hearing for both cases, where the City

125

prosecutor and County prosecutor each presented their case. For the City conviction, the court sentenced Coleman to 15 years' imprisonment with 8 years suspended. On the County convictions, the court sentenced Coleman to 20 years' imprisonment with 5 suspended for malicious wounding, 10 years' imprisonment with 5 suspended for abduction, and 1 year's imprisonment for reckless driving. Coleman sought habeas relief from the City and County sentences in state court, and the court denied those petitions in orders entered two days apart. Coleman then sought review in the Supreme Court of Virginia, which dismissed his County appeal and then four months later denied his City appeal.

The district court dismissed Coleman's federal habeas petition challenging the sentences on his County convictions as untimely under AEDPA's one-year statute of limitations. *See* 28 U.S.C. § 2244(d)(1); J.A. 209–210. Coleman does not contest that decision on appeal. And the majority finds no error in the district court's timeliness ruling. Therefore we may not grant habeas relief on Coleman's County sentences. *See* 28 U.S.C. § 2244(d).

The majority cannot skirt Congress's unambiguous directive by incorrectly asserting that the state court imposed a "combined sentence" on the City and County offenses that cannot be untangled. Maj. Op. 75–76. It is true that the sentencing judge, sitting as both the Circuit Court for the City of Roanoke and the Roanoke County Circuit Court, conducted a joint sentencing hearing. But that does not give us authority to order resentencing on a judgment that is not before us. These cases involved separate proceedings in separate courts with separate dockets, pursued by separate prosecutors in

126

separate jurisdictions, with separate guilty pleas and separate sentences, resulting in separate orders denying state habeas relief. That the sentencing hearing was conducted jointly before the same judge does not alter the separateness of the judgments. Moreover, the state court sentenced Coleman to 15 years' imprisonment with 8 years suspended on the City conviction—the only one properly before us—and to a *longer* sentence on the County convictions. For this Court to order resentencing by the state court on both sets of convictions exceeds our authority under AEDPA.

If that unwarranted intrusion into the state criminal process were not enough, the majority goes further by suggesting that the sentencing judge should be replaced on resentencing. Maj. Op. 97 n.13. I cannot join such an egregious overreach into the operation of Virginia's criminal courts.

## V.

Federal habeas corpus "is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102–103 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). No such malfunction occurred here. Applying the standards of *Strickland v. Washington*, the state court denied Coleman's habeas petition because, even if his sentencing counsel performed deficiently, Coleman was not prejudiced. That decision was not "objectively unreasonable," *LeBlanc*, 582 U.S. at 94 (internal quotation marks omitted), or erroneous "beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103. AEDPA therefore requires that Coleman's petition for federal habeas relief be denied. The majority concludes otherwise, reviewing Coleman's challenge to his state criminal sentence de novo

127

and then extending relief to other sentences on different state convictions not before this

Court on appeal.  Accordingly, I must respectfully dissent.

128